ST. GERMAIN'S ADMR. *v.* RIFORD TUTTLE ET ALS.

May Term, 1945.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT, J.J. and BLACK, Supr. J.

Opinion filed October 2, 1945.

*Hanford G. Davis* and *Vernon J. Loveland* for the plaintiff.

*Lawrence & O'Brien* for the defendant Tuttle.

*Asa S. Bloomer* for the defendant, Advent Christian Church.

*Leon M. Layden* for the defendant Strubbe.

SHERBURNE, J. This is a suit for an accounting. The bill of complaint alleges improper investment of trust funds by defendant Tuttle. The answers of the defendants Advent Christian Church and Stella Strubbe admit that the investment was a breach of trust, and conclude with a prayer that defendant Tuttle be directed to make restitution and pay to them such sums as rightfully are due them. The bill of complaint was dismissed, and the prayers in the answers of defendants Advent Christian Church and Stella Strubbe were denied and dismissed. The plaintiff and the Advent Christian Church have alone excepted. There are no exceptions to the findings of fact.

From the lengthy findings of fact we cull the following information. The plaintiff is the administrator of the estate of his former wife, Mary, whom he married in 1939, and who died in 1942 at the age of 69 years. She was the widow of Albert Resseguie, uncle of defendant Tuttle, whom she married in 1893, and who died in 1931. Since 1893 she had owned certain real estate, and prior to late in 1932 she had conducted a small business of making switches and wigs. She came to defendant Tuttle's house for Thanksgiving dinner in 1932 and told him that she was destitute and didn't know how she was going to get on because she was unable to get income from her real estate, and that she wanted assistance in her affairs. On account of her relationship and acquaintance with him she had confidence in him and in his business ability. Soon afterwards she arranged to sell her real estate to Charles McMaster for $10,000.00. On December 29, 1932, she, as grantor, and Tuttle, as grantee, entered into an agreement under seal, which, among other things, contained the following provisions:

> "WHEREAS the Grantor has made a sale of certain real estate owned by her in the City of Rutland and entered into an agreement for the conveyance of the same under the terms of which payment will be made on the third day of January, 1933, and
>
> "WHEREAS the Grantor desiring that Three Thousand and Seven Hundred and Fifty (3750) Dollars

of the proceeds of said sale shall be held upon the trusts hereinafter set forth, has this day executed and delivered to Charles R. McMaster an order for the sum of Three Thousand Seven Hundred and Fifty (3750) Dollars, to pay to the Grantee herein said sum on said third day of January, 1933.

### "NOW THEREFORE THIS AGREEMENT WITNESSETH:

"That the Grantee will receive the sum of Three Thousand Seven Hundred Fifty (3750) Dollars, as aforesaid, to be deposited hereunder and any other sums of money to be deposited hereunder, subject to the terms and conditions hereof, and he will hold the same in trust, for the following uses and purposes:

"First: The Grantee shall hold the trust estate during the lifetime of the Grantor, in trust, to collect the income therefrom and pay the same, together with such principal of the trust estate as may be necessary, as herein set forth.

"(a) The Grantee shall pay said income in quarterly installments to the Grantor upon her own order and receipt.

"(b) And in addition to the payment of income as above set forth, the Grantee may, in his discretion, pay to the Grantor, or for her benefit, such sum or sums as may be reasonably necessary to provide for a comfortable maintenance of the Grantor commensurate with a person in her station in life, in sickness or in health, from the corpus of said trust estate.

"(c) Upon the decease of the Grantor, and after payment of all necessary expenses in connection with said trust, including any and all obligations properly chargeable against it, to pay to her brother, Louis B. Strubbe, now of Whitehall, New York, if he then be living, or in the event of his death, to his wife, Stella Strubbe, the sum of Three Hundred (300) Dollars, he or she to have and to hold the same for-

ever, and in the event that both Louis and Stella Strubbe pre-decease the Grantor, then this payment shall lapse and become a part of the residue of this trust. After the above payment is made, then to pay to the Advent Christian Church of Rutland, Vermont, to it, its successors and assigns, all the rest, residue and remainder of said trust estate, to have and to hold the same forever.

\* \* \* \* \*

"Third: The Grantee and-or his successors in trust, is hereby authorized to invest and reinvest the trust estate in such securities as the Grantee may, in his discretion, see fit, without being limited to the class of securities in which trustees are authorized by law to invest funds.

\* \* \* \* \*

"Sixth: The Grantor specifically waives all right to revoke, modify or amend this agreement in any manner whatsoever."

On January 3, 1933, Tuttle received from McMaster the sum of $10,000.00 in payment for the real estate, and in order to complete the sale had to pay a mortgage upon the property and other obligations amounting to $1240.03. From the net avails he purchased two annuities for the said Mary at an expense of $5000.00, paid certain sums to or for her, and invested $3300.00 in 33 shares of the 5% preferred stock of the Tuttle Company. The only questions raised concern the propriety of the investment in this stock and the subsequent exchange of this stock for a like amount of 5% preferred stock in the Tuttle Publishing Company.

The Tuttle Company was organized in 1884 by Tuttle's father and uncles, and Tuttle became associated with the business in 1906 as an officer and stockholder, and was familiar with the business from that time on. It was one of the largest printing establishments in the State and had substantial State contracts for many years. It did a bindery business, a rare book business, and had a wholesale and retail store where stationery supplies, paints and wall papers were sold. It had been a large borrower at the banks

over a period of years, and at the time of the Bank Holiday in 1933 its total liabilities, including $60,000.00 of common stock, were $80,000.00. On account of the Bank Holiday it was unable to borrow at the banks, and had trouble in keeping its business going and meeting its accounts payable, and an effort was made to compromise its unsecured liabilities at twenty-five cents on the dollar. The only other preferred stock sold was 5 shares to Berenice Tuttle, a sister of defendant Tuttle. There was no market value for either the preferred or common stock because it had always been a closed corporation. At the time the 33 shares of preferred stock were purchased the common stock had not paid a dividend for more than two years, and the business of the company, especially the wholesale store business, was on the decline. The money received for the 33 shares of stock furnished fresh money for the company, and was used to pay expenses and bills in a general way.

Subsequent to the purchase of the 33 shares of preferred stock the company gave chattel mortgages on all its personal property to the Central National Bank of Rutland and to Berenice Tuttle, as trustee of the estate of E. C. Tuttle, and at a foreclosure sale on July 26, 1935, all the property covered by the mortgages was sold to Charles E. Tuttle for less than the amount due on the mortgages. This sale was followed by a reorganization of the business of the Tuttle Company, whereby the defendant Tuttle took over the stationery business, Charles E. Tuttle, a brother, took over the rare book business, and a new corporation, the Tuttle Publishing Company, took over the printing business. This latter corporation voted to issue 38 shares of 5% preferred with a par value of one hundred dollars each and 600 shares of common with a par value of fifty dollars each for the consideration of cash and other property to the amount of $33,800.00.

In the dissolution of the Tuttle Company and the organization of the Tuttle Publishing Company arrangements were made so that the holders of the preferred and common stock in the old company were given the same number of shares in the new company. Defendant Tuttle did not receive any cash for the 33 shares of stock in the Tuttle Company, but on August 23, 1935, accepted in exchange a certificate for 33 shares of preferred stock in the new company issued in the name of Mary Resseguie. The stock of this new company was not a stock that was bought or sold or

traded in. It has never paid dividends on its common stock. Defendant Tuttle has been a director of this company since its organization.

On the same day that the Tuttle Publishing Company issued its stock it gave chattel mortgages upon all its property to the amount of $16,266.22. Its Federal Income tax returns show that in 1935 it made a profit of $1513.91, and that in subsequent years there were losses as follows: In 1936, $1507.77, 1937, $1647.18, 1938, $1790.75, and in 1940, $5101.17. The profit and loss statement for the year ending December 31, 1942, shows a loss of $13041.97.

Tuttle believed that it was proper to invest the $3300.00 in the preferred stock of the Tuttle Company, a corporation in which he was a director, officer and stockholder, because he knew about the business and believed it to be a good investment at the time he made it. Although at the time of the dissolution of this corporation there were sufficient assets to pay off this stock in cash he made no effort to cash it in, and made no investigation to see if it could be converted into cash, because he thought that the stock in the Tuttle Publishing Company was a good investment, and that it was better for the said Mary to have her money invested there than to have it in cash.

At the time Tuttle invested the $3300.00 in the stock of the Tuttle Company he conferred with the said Mary and she approved of the investment. At the time of the exchange of this stock for that of the Tuttle Publishing Company he conferred with her and she approved of the change. On October 1, 1934, he rendered an account to her showing that he had $62.85 in the bank, $197.31 deposited with the Tuttle Company, the 33 shares of stock yielding a yearly income of $165.00, and the annuities yielding an income of $405.24. In 1936 she visited him and he explained about the investment, and that she was receiving 5% on the stock. On September 15, 1937, he rendered an account to her which started with $197.31 cash on hand and $62.85 in the bank, and showed dividends on the stock for three years at $165.00 per year, and the checks received on the annuities. This account showed the payment of her rent amounting to $780.00, the payment of $100.00 to adjust an income tax claim against her, the payment to her for living expenses of $4.00 a week for 39 weeks and $5.00 per week for 117 weeks, and that he had advanced cash to her or

for her benefit at other times, and that there was left $110.98 in his hands. Her approval of this account is shown on page 3 thereof. On September 28, 1939, he rendered another account showing the receipt of dividends on the preferred stock on March 1, 1938, and March 1, 1939, amounting to $165.00 for each year, and checks from annuities amounting to $810.48. This account showed that he had paid her rent for two years to the amount of $520.00, and had turned over to her $5.00 a week regularly, and a few other small items, and that he had $143.71 cash on hand. At some time previous to April 5, 1940, and after her marriage to the plaintiff, she employed an attorney to represent her, and on that date Tuttle rendered an account showing a balance of $149.64, which was witnessed and approved by her attorney. At each time Tuttle rendered an account to the said Mary he showed her the certificate for the preferred stock. On October 28, 1940, Tuttle "made a settlement" with the said Mary, and they signed an agreement, witnessed by her attorney, which reads as follows:

> "We, the undersigned, being the only parties in interest in the above trust estate, hereby acknowledge receipt of all the trust property and assets remaining in the hands of said trustee, assent to the foregoing account, request its allowance and the discharge of said trustee, and waive all further notice in respect thereto."

At that time Tuttle had turned over to her attorney the balance of cash on hand, together with the stock certificate, annuity contracts, and any other assets that he had at that time that belonged to the said Mary.

The trust agreement was expressly made irrevocable. Under its terms the said Mary took a life estate only. *Park's Admr.* v. *American Home Missionary Soc.*, 62 Vt 19, 20 A 107; *In Re Estate of Hayward*, 93 Vt 404, 410, 108 A 345; *In Re Estate of Curtis*, 109 Vt 44, 50, 192 A 13. Except as to the sum of $300.00 the Advent Christian Church took a vested remainder, *Peck* v. *City Trust Co.*, 104 Vt 20, 31, 156 A 403, which was liable to be divested to the extent that Tuttle might, in his discretion, expend from the corpus such sums as might reasonably be necessary for the comfortable maintenance of the said Mary commensurate with

her station in life, but it could be defeated in no other manner. *Hare* v. *Congregational Soc.,* 76 Vt 362, 57 A 964.

 We have no special rule prohibiting the investment of trust funds in the stock of private corporations, and the trustee's liability is to be tested by the care and diligence of a prudent man in like circumstances. *Scoville* v. *Brock,* 81 Vt 405, 419, 70 A 1014. In the absence of provisions in the terms of the trust the trustee is to make such investments and only such investments as a prudent man would make of his own property, having primarily in view the preservation of the estate and the amount and regularity of the income to be derived. Rest. Trusts, vol. 1, § 227. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested. *Harvard College* v. *Amory,* 9 Pick, 446; *Brown* v. *French,* 125 Mass 410, 28 Am Rep 254; *Dickinson, Appellant,* 152 Mass 184, 25 NE 99, 9 LRA 279; *Kimball* v. *Whitney,* 233 Mass 321, 123 NE 665. He must always bear in mind that the primary object of the creation of the trust is the preservation and perpetuity of the fund until the time for its distribution arrives; and he must make no investment by which this object may be at all likely to be defeated. *Re Estate of Buhl,* 211 Mich 124, 178 NW 651, 12 ALR 569. Among the matters which the trustee should consider in selecting a given investment are the marketability of the particular investment and the probable conditions of the market with respect to the value of the particular investment at the termination of the trust. Rest. Trusts, vol. 1, § 227, Comment m. As shown by the foregoing cases trustees are permitted to make a reasonable investment in dividend paying stocks of private business corporations, when the corporations have acquired, by reason of the amount of their property, and the prudent management of their affairs, such a reputation that cautious and intelligent persons commonly invest their own money in such stock as a permanent investment, but not otherwise.

 The language used in the third provision of the trust agreement does not release the trustee from the obligation to exercise a sound judgment and a reasonable and prudent discretion. *Davis, Appellant,* 183 Mass 499, 67 NE 604; *Mattocks* v. *Moulton,* 84 Me 545, 24 A 1004; *Kimball* v. *Reding,* 31 NH 352, 64

Am Dec 333; *In Re Hall,* 164 NY 196, 58 NE 11. His purchases of stocks should be limited to those having market value. *Kimball* v. *Reding, supra.* He should not invest in new, speculative or hazardous ventures. *In Re Hall, supra.*

That Tuttle honestly believed that the investment of the $3300.00 in the preferred stock of the two Tuttle companies was a good one to make, it is not our province to question. But that as an investment it had none of the features of safety which we have described, or that Tuttle could not for a moment have imputed to it these qualities, is too plain for doubt. The Tuttle Company was a heavy borrower at the banks, no dividends had been paid on its common stock for over two years and its business was on the decline. The Tuttle Publishing Company started out without any surplus and on the same day that it issued its stock it mortgaged all its property for over $16,000.00, and soon began to lose money. Both companies were comparatively small and their stock was never sold upon the market, and its probable value at the termination of the trust was very uncertain. Unless he planned to engage actively in the management of such a corporation no prudent person would buy its stock. He would never buy it simply for an investment, much less would he invest trust funds in it.

Since estoppel is not pleaded by Tuttle we need not determine if the said Mary in giving her approval of the investment, accepting the returns therefrom, or signing the agreement of October 28, 1940, acted with sufficient knowledge of the relevant facts and of her legal rights to be bound thereby.

The plaintiff calls attention to the rule, that whatever may be the reason or motive that prompts it, if the trustee commingles the trust property with his own, and the commingling is followed by actual loss, accidental or otherwise, the trustee must make good, not only the principal sum, but also the interest at the highest legal rate. *Re Hodges' Estate,* 66 Vt 70, 28 A 663; *Farwell* v. *Steen,* 46 Vt 678; *McClosky* v. *Gleason,* 56 Vt 264, 48 Am Rep 770. He claims that he is entitled to recover interest at 6% upon the $3300.00 from the time it was invested in the Tuttle stock until the death of Mrs. St. Germain on October 8, 1942, less such sums as were paid in dividends, or at any rate from October 28, 1940, to October 8, 1942. No question is made that she received 5% dividends upon the stock up to October 28, 1940, and it is not found that she did not receive dividends thereon from the time the stock certificate

was surrendered to her on October 28, 1940, to the date of her death. Evidence is recited in the findings from which it might possibly be inferred that dividends were not paid after the certificate was surrendered to her, but that is insufficient as a finding of fact. *Hammonds, Inc.* v. *Flanders,* 109 Vt 78, 81, 191 A 925, and cases cited.

■ Ordinarily if a breach of trust consists in an improper purchase of property for the trust, the trustee is chargeable with interest at the current rate of return on trust investments, unless the breach of trust was intentionally committed, in which case he is ordinarily chargeable with interest at the legal rate. Rest. Trusts, vol. 1, § 207(1), Comment c; *Albright* v. *Jefferson County National Bank,* 292 NY 31, 53 NE2d 753, 151 ALR 897; *Miller* v. *Pender,* 93 NH 1, 34 A2d 663, 150 ALR 798. The real question is what the equities of the particular case demand. *Backus* v. *Crane,* 87 NJ Eq 229, 100 A 900.

■ The findings must be construed so as to support the decree, if this can reasonably be done. *Cook* v. *Holden,* 113 Vt 409, 413, 35 A2d 335; *Taylor* v. *Henderson,* 112 Vt 107, 115, 22 A2d 318; *Gardner* v. *Gauthier,* 101 Vt 147, 149, 141 A 682; *Reed* v. *Hendee,* 100 Vt 351, 354, 137 A 329. Considering all the circumstances and the low rate of yield from trust investments during the entire period of this trust agreement, we cannot say that the equities, as a matter of law, demand that Tuttle should have paid the said Mary more than she actually received. The facts found do not compel the awarding of interest at the highest legal rate, as in *Re Hodges' Estate, supra.* The result is that the decree in respect to dismissing the bill must be affirmed.

■ A remainderman is not estopped to complain of improper investments because of the consent or acquiescence of the life tenant. Rest. Trusts, vol. 1, § 216, Comment g, and § 219, Comment e; *Bennett* v. *Pierce,* 188 Mass 186, 74 NE 360; *Zimmerman* v. *Frailey,* 70 Md 561, 17 A 560. For further cases see Annotation, 128 ALR 22. There is no claim made that the Advent Christian Church is estopped. On the contrary, the findings show that Tuttle never submitted any account to the Church and never consulted with it when he turned the preferred stock certificate over to Mrs. St. Germain, and there was no evidence that the Church had any knowledge of that transaction.

Under Chancery Rule 27 a defendant who desires affirmative

relief may add to his answer such allegations as he claims entitle him thereto, with proper prayer, prefacing such allegations with a statement in substance, that "by way of cross-bill exhibited against the plaintiff this defendant says." Necessary changes of form shall be made when the affirmative allegations are against a co-defendant, and service shall be made upon the co-defendant under the order of the chancellor. The answer contains no formal cross-bill, but it in effect adopts the allegations of the bill as to a breach of trust, and concludes with a prayer for relief against defendant Tuttle. No service was made upon Tuttle, but the filing shows that a copy was delivered to him. No question is made about these informalities, and we will treat the case as though a proper cross-bill against defendant Tuttle had been included in the answer, and that it had been served upon him.

Upon the death of Mrs. St. Germain the church was entitled to its share of the money invested in the Tuttle stock unimpaired by Tuttle's breach of trust. *Bennett* v. *Pierce, supra,* 188 Mass 186, 74 NE 360; *Zimmerman* v. *Frailey, supra,* 70 Md 561, 17 A 560. See also Rest. Trusts, vol. 1, § 205, Comment c. There is no finding from which it can reasonably be inferred that Tuttle was called upon to use any part of the principal sum invested in the Tuttle stock for the maintenance of Mrs. St. Germain, so the Church is entitled to the $3300.00 less the $300.00 provision for defendant Strubbe. As payment was due on October 8, 1942, the date of the death of Mrs. St. Germain, interest will be computed from that time at 6%.

*That part of the decree dismissing the bill is affirmed, and that part denying and dismissing the prayer of defendant Advent Christian Church is reversed, and it is ordered and decreed that defendant Tuttle pay to the Advent Christian Church the sum of three thousand dollars with interest at 6% from October 8, 1942, and its costs.*