In Re: Trust Estates of Merrill D. Wheeler, No. 264-6-03 Wrcv (Teachout, J., Dec. 30, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WINDSOR COUNTY, SS.**


| | | |
|---|---|---|
| | ) | |
| **In re:** | ) | **Windsor County Superior Court** |
| **Trust Estates of Merrill D. Wheeler** | ) | **Docket No. 264-6-03 Wrcv** |
| | ) | |


<u>**Memorandum of Decision**</u>

**STATE STREET BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**and**
**ARTICLE III TRUST BENEFICIARIES' MOTION FOR SUMMARY JUDGMENT**


Merrill Wheeler died in 1966, leaving a will and codicil under which he created three trusts, one each under Articles II, III, and IV.  State Street Bank and Trust is the Trustee of the Article III and IV trusts.  A dispute developed during the administration of the trusts in Probate Court.  It involves, in addition to the Merrill Wheeler trusts, interests created under the will of Mr. Wheeler's surviving spouse, Mary Wheeler, who died in 1999 and was a beneficiary of all three trusts.  Mary Wheeler, in her will, appointed Linda Moore the Executrix of the will, made Linda Moore the residuary beneficiary of her estate, and exercised her testamentary power of appointment over the remainder of the Article IV trust in favor of Linda Moore.

In Probate Court, Linda Moore filed a petition seeking to surcharge State Street Bank for losses she claims she suffered in various capacities as a result of State Street's conduct in administering the trusts.  State Street moved for summary judgment in Probate Court on all claims against it, and its Motion was granted.[1]   Linda Moore appealed to Superior Court,

---

[1] Decision & Order, *In re: the Trust Estates of Merrill D. Wheeler*, Nos. 1049, 1995, 1996 (Probate Court, Windsor District, March 6, 2003).

whereupon State Street moved for summary judgment in Superior Court on December 2, 2003. The Article III beneficiaries filed a related motion for summary judgment on January 2, 2004.

Following the first oral argument on June 15, 2004, the parties have filed additional statements of facts and additional memoranda. On August 24, 2004, the Court issued an Entry Order ruling that the court has jurisdiction to address the Article III Trust Beneficiaries' motion, even though there was no specific ruling on the subject matter in Probate Court.

Attorneys William C. Lewis, Jr., and Mark D. Oettinger represent Linda Moore. Attorney Karen McAndrew represents State Street Bank. Attorney Stephen S. Ankuda represents the Article III Beneficiaries (also known as the Sawyer Beneficiaries).

State Street seeks judgment as a matter of law on Linda Moore's claims to surcharge it to compensate her for: (1) a 1987 transfer of land from the Article II Trust without consideration, (2) distributions of principal totaling $225,000 during 1987 from the Article IV Trust, (3) and payments totaling $169,689 made during 1988 through 1991 from the Article IV Trust to Ralph Morrison and others. Both State Street and the Article III beneficiaries seek judgment as a matter of law on Linda Moore's claim either against trust assets or as a surcharge against State Street for $135,715 for payments made by Mary Wheeler personally for taxes, insurances and other expenses associated with maintaining the Article II Trust property.

## Undisputed Material Facts[2]

### *Merrill Wheeler's Will*

Merrill Wheeler died testate on July 26, 1966. In his will and codicil, he set up three trusts. The first consisted only of his real estate holdings in Vermont (approximately 750 acres with a 9-room house), and was to be administered by two individual trustees, who were his wife, Mary Wheeler, and Ralph Morrison. The balance of his estate was divided equally between the other two trusts, each to be administered by State Street as Trustee. The Article III trust income was to be paid to his wife during her life, and the principal was available for her benefit, but upon her death the principal was to be distributed to Merrill Wheeler's relatives. The Article IV trust income was to be paid to his wife during her life, and the principal was available for her benefit, but upon her death the principal was to be distributed to those she appointed in her will, with alternative default provisions.

---

[2] The facts consist of undisputed facts derived from the parties' statements of undisputed facts under V.R.C.P. 56(c)(2), to the extent they are supported by underlying evidence in the record. Conclusory statements or advocacy positions are not included or are identified as parties' positions without being relied upon as fact. The Court has declined to draw many inferences as requested by the parties.

Article II of the Merrill Wheeler Will provides as follows:

> SECOND: All my real estate in Vermont which I may own at the time of my death, I give, devise, and bequeath to my wife, Mary B. Wheeler, and [Ralph W. Morrison, of Needham, Norfolk County, Massachusetts],[3] as Trustees, for the use and benefit of my said wife for her life, with full power to them and the survivor of them to sell and convey the same, in whole or in part, from time to time without license of any court, and upon such terms as they, in their uncontrolled discretion shall deem favorable. Upon the sale of such premises, in whole or in part, the said Trustees shall pay and distribute the proceeds thereof to the Trustees of the residuary trusts hereinafter provided for, but they may withhold from such proceeds such sums as they deem necessary to provide them with sufficient cash to pay or indemnify themselves against any taxes, expenses, and upkeep of any of the trust property for which they might be liable until such time as such necessity, in their opinion, no longer exists; and if such sum shall prove to be insufficient for such purposes, the Trustees of such residuary trusts are hereby authorized to reimburse the Trustees hereunder for any such expense.

Article III of the Merrill Wheeler Will provides, in relevant part, as follows:

> THIRD: One-half of all the rest, residue, and remainder of my property I give, devise, and bequeath to State Street Trust Company, of Boston, Suffolk County, Massachusetts, as Trustee hereunder upon the following trusts, namely:
>
> A. The Trustee shall pay the net income of the trust property quarterly, or oftener at her request, to my wife, Mary B. Wheeler, for her life and after her death to pay such income to my brother, Frank E. Wheeler, of Antrim, Hillsboro County, New Hampshire.
>
> B. After the death of my said wife and my said brother, the Trustee shall pay and distribute the trust property to my niece, Frances Wheeler Sawyer, of Braintree, Norfolk County, Massachusetts, if she shall be then living. If she shall not then be living, the Trustee shall pay and distribute the trust property to her issue, taking by right of representation.

Article IV of the Merrill Wheeler Will provides, in relevant part, as follows:

---

[3] In his original will dated January 8, 1952, Merrill Wheeler named his nephew Winslow A. Sawyer as the second trustee of the Article II Trust. However, Mr. Wheeler executed a codicil on September 3, 1964, naming Ralph W. Morrison as the second trustee of the Article II Trust.

FOURTH: The other one-half of all the rest, residue, and remainder of my property, including in this half any other real estate which I may own, I give, devise, and bequeath to State Street Trust Company, of Boston, Suffolk County, Massachusetts, as Trustee hereunder upon the following trusts, namely:

      A.  The Trustee shall pay the net income of the trust property quarterly, or oftener at her request, to my wife, Mary B. Wheeler, for her life, and after her death the Trustee shall pay and distribute the trust property held under this clause to and among such persons, including the estate of my said wife, and in such proportions as she by her last will shall appoint, and in default of such appointment the Trustee shall administer and dispose of the trust property as provided in the following paragraphs C, D, and E.

      B.  The Trustee may also, in its discretion, during the life of my said wife distribute to her such parts of the principal from time to time as it may deem desirable for the support, comfort, and general welfare of my said wife.

Paragraphs C, D and E of Article IV provide that, in the event Mary Wheeler fails to exercise the power, or exercises it incompletely, the income is to be paid to Merrill Wheeler's brother for life, if he survives, and following his death, certain bequests totaling $58,000 are to be made to named persons and the rest and remainder distributed to [the Sawyer Beneficiaries as described in Article III(B)].

All three trusts remain under administration in the Windsor District Probate Court pending resolution of the issues now before this Court and the completion of administration in the Probate Court.

*Article II Trust (consisting solely of real estate)*

The initial Co-Trustees of the Article II Trust were Mary Wheeler, the widow of Merrill Wheeler, and Ralph Morrison, the nephew of Mary Wheeler.  Mary Wheeler served as the sole Trustee of the Article II Trust from the date of Ralph Morrison's death on May 8, 1995, to the date of Mary Wheeler's death on November 15, 1999 at the age of 101.  The property at the time of Merrill Wheeler's death consisted of 750 acres of land and a 9 room house.

In 1973, the Article II Trust sold an easement, and proceeds of $6,000 were delivered to State Street, which was the Trustee for the Article III and Article IV Trusts.  The 2nd Accounting

4

filed by State Street reflects that those proceeds were divided equally between the Article III and Article IV Trusts.[4]

There were no other sales of Article II property prior to 1987. As early as 1967, however, there was some discussion about the possibility of Ralph Morrison purchasing a portion of the Vermont property from the Article II Trust. Correspondence from and to Thomas Jansen, then attorney for the Estate of Merrill Wheeler, indicates that the idea was discussed among the Article II Trustees and some other potential beneficiaries.[5]

*Attorney Steven Goodwin*

Commencing in December of 1983, Mary Wheeler and Ralph Morrison engaged Attorney Steven C. Goodwin, with the firm of Burns & Levinson in Boston, Massachusetts, to represent them in their capacity as co-Executors of the Merrill Wheeler Estate. They initially engaged Goodwin to help them with completing their administration of the Merrill Wheeler Estate in Vermont, including completing and filing the Vermont Inheritance and Income Tax forms. Sometime after 1984, Goodwin also began to represent them in their capacity as Co-Trustees of the Article II Trust. Goodwin dealt primarily with Morrison. The arrangement changed in 1987, when Goodwin became suspicious of Morrison's motivation in connection with his activities as Trustee of the Article II Trust. Later, in 1995, Goodwin represented Mary Wheeler in her capacity as beneficiary of the Article III and Article IV Trusts.[6]

Mr. Goodwin continued to represent Mary Wheeler and Ralph Morrison in 1986, 1987, and 1988. In about April of 1987, when Goodwin had concerns about Morrison's motivations, he called Mary Wheeler and advised her it was in her best interest to obtain independent counsel.

Mr. Goodwin did not at any time advise State Street that he no longer represented Ralph Morrison or Mary Wheeler. He never wrote to Ralph Morrison terminating his representation of Morrison in connection with the Merrill Wheeler Estate. He also never sent a letter to Mary Wheeler either terminating his representation of her, or advising her that she should consult with

---

[4] Receipt dated December 24, 1973, indicating that State Street Bank had received $6,000 from Mary Wheeler and Ralph Morrison, which Vermont Electric Power Company had paid for an easement deed in the Town of Cavendish, Vermont. State Street's Exhibit 1-B. State Street submitted one set of exhibits with its motion for summary judgment on December 2, 2003 (designated with a "1-"), and a second set of exhibits with its supplemental statement of facts on June 30, 2004 (designated with a "2-").

[5] Letter dated November 8, 1967, from Attorney Thomas E. Jansen, Jr., to Mrs. Winslow A. Sawyer, and letter dated November 21, 1967, from Frances Wheeler Sawyer to Mr. Jansen. State Street's Exhibit 1-C.

[6] Goodwin Deposition (March 27, 2002), State Street's Exhibit 2-A and Linda Moore's Tab 1. Linda Moore submitted her tabbed exhibits as part of her Response to State Street's Additional Facts, on July 12, 2004.

other counsel. At some point, Morrison stopped using Goodwin's services. On April 30, 1992, Goodwin sent Morrison a bill for professional services rendered in connection with the Merrill Wheeler Estate between July of 1986 and November of 1988.[7] That statement does not refer to meetings, telephone conferences, or correspondence with Mary Wheeler.[8]

In November of 1999, Goodwin received, from State Street, a copy of the 1999 accountings for the Article III and Article IV Trusts. He does not remember receiving any accountings for those trusts prior to November of 1999.[9]

*Proposed Plan to Sell Article II Property*

As early as mid-1986, Goodwin began discussing a possible sale of Article II Trust property to State Street in its capacity as Trustee of the Article III and Article IV Trusts. Goodwin discussed this plan with Joan Preiss and Sharon Doherty-Clancy, the State Street Bank officers in charge of the Wheeler trusts, and he also discussed it with attorneys in Vermont. He also proposed a transfer of approximately 50 acres to Mary Wheeler, plus a distribution of about $150,000 to $175,000 to her, for the purpose of constructing a smaller and more suitable house for her in Vermont. He also asked Vermont Attorney Philip Johnson about the procedure to be followed to allow Ralph Morrison to purchase some of the property.[10]

State Street has submitted a handwritten memo dated September 18, 1986. Although not fully authenticated, this document appears to be an internal memo from State Street Trust Officer Joan Preiss to Stephen Bergquist, a legal officer at the bank, concerning questions that Steven Goodwin had raised about the Article II Trust property. The text of the memo is as follows (with handwritten responses, by another hand, indicated in bold):

9/18/86
T10543/4

Steve:

---

[7] Goodwin Deposition, State Street's Exhibit 2-A, at 114-15. Also Goodwin's cover letter with invoice, dated April 30, 1992, State Street's Exhibit 2-B.

[8] Goodwin Deposition, State Street's Exhibit 2-A and Linda Moore's Tab 1. Also letters included in State Street's Exhibit 2-B, including Goodwin's cover letter with invoice, dated April 30, 1992.

[9] Deposition of Steven C. Goodwin, Linda Moore's Tab 1, at 127.

[10] Steven Goodwin letter to Philip Johnson, dated September 15, 1986; Goodwin letter to Sharon Doherty-Clancy, dated February 4, 1987; and Goodwin invoice sent to Ralph Morrison on April 30, 1992, State Street's Exhibit 2-B.

The attached will provides for Mary Wheeler and Ralph Morrison to be co-Trustees of a trust containing only real property in Vermont. Mrs. Wheeler has the use of the property during her life. It is unclear what happens upon her death, is the property to be sold and proceeds added to the two trusts or how is it to be handled? **Not well drafted, but it seems that the property goes 1/2 each to the Article 3 and 4 Trusts.**

Ralph Morrison has put about $50,000 of his own money into the property over the years, thinking that he would eventually get 1/2 of the sale proceeds (Mrs. Wheeler apparently has appointed the tr. u/ Cl. 4th to him). Now he's questioning whether he will ever see that and if not, can the trusts reimburse him.

. . . [some text missing from the copy] . . .
[illegible] expenses on the property. Mrs. Wheeler pays taxes ($12,000/yr), and insurance out of pocket. If the property eventually comes to the trusts can we pay these expenses from the principal on an ongoing basis? **These charges would ordinarily come from income.**

Please take a look at the instrument and let me known when you have time to discuss it. Steve Goodwin has written to the trust's attorney in Vermont for a legal opinion on the disposition of the real estate.

Thanks,
Joan
(3319)[11]

While it is not clear who wrote the handwritten responses on the Preiss memo, it appears undisputed from them that State Street was on notice that at some point, either the death of Mary Wheeler or the sale of property, Article II trust assets would be transferred to the Article III and IV trusts.

On September 15, 1986, Steven Goodwin wrote a letter to Attorney Philip Johnson in Vermont, asking for Johnson's views on the disposition of remaining Article II property at the death of Mary Wheeler, and also asking about a possible sale of Article II property to Ralph Morrison, a co-Trustee of that trust. ("I would like to know what procedure must be followed to allow one of the Trustees (Mr. Morrison) to purchase the property.") Goodwin also advised Johnson that there was no conflict in Johnson taking on representation of Ralph Morrison and Mary Wheeler in connection with this matter.[12]

Henry Tilghman, an attorney in Philip Johnson's office, responded to Goodwin's September 15, 1986 letter on October 2, 1986. Tilghman informed Goodwin that it would be

---

[11] Memo from "Joan" to "Steve" dated 9/18/96. State Street's Exhibit 1-D.

[12] Letter from Steven Goodwin to Philip Johnson dated September 15, 1986. State Street's Exhibit 1-E.

necessary for the Article II Trustees to obtain a license to sell the Vermont real estate from the Probate Court, but that it would not be necessary to notify beneficiaries, because the Will contained a power of sale. Tilghman's letter also suggests that one way to avoid a potential intestacy of real estate remaining in the Article II Trust at the death of Mary Wheeler would be for the Article III and Article IV Trusts to purchase the real estate from the Article II Trust. Tilghman opines that if there were such a sale, "the consideration paid would be moot, because the proceeds of such a sale would then revert back" to the Article III and Article IV Trustees by the operation of Article II. (In his deposition, Goodwin testified he believed that it might have been his idea to have the Article III and Article IV Trusts purchase the property, and that perhaps he and Tilghman had discussed it over the telephone before Tilghman had drafted his letter.)[13] Tilghman's letter requested more time to research Vermont law on whether Article II Trust property could be sold to Ralph Morrison, a co-Trustee of that Trust. The letter did indicate, however, that "[o]f course, Mr. Morrison would have to offer to pay the fair market value for the real estate before the court would consider issuing a license to sell to him."[14]

There is evidence that Steven Goodwin and Ralph Morrison had discussions about the Merrill Wheeler Trusts with bank officers Sharon Doherty-Clancy and Joan Preiss during the fall and winter of 1986-87. Goodwin's invoice to Ralph Morrison reflects a two-hour conference with Morrison and Preiss on September 16, 1986, three hours of meetings with the bank and in his office on October 22, 1986, a one-hour meeting with Morrison and with State Street Attorney Steve Bergquist on March 12, 1987, and a 2.75 hour meeting on April 2, 1987, at State Street.[15]

On February 4, 1987, Steven Goodwin submitted a formal written request to Sharon Doherty-Clancy that State Street, Trustee of the Articles III and IV Trusts, consider purchasing the Article II Trust property. He mentioned in his letter that there was uncertainty under the Will of Merrill Wheeler about the disposition of any Article II Trust property remaining in that Trust at the death of Mary Wheeler. He outlined a plan whereby the Article II Trust would sell the Vermont real estate (approximately 750 acres with a 9-room house) to State Street as Trustee for the Article III and IV Trusts, reimburse Mary Wheeler and Ralph Morrison for expenses they had incurred in maintaining the property, and then divide the remaining proceeds between the Article III and IV Trusts. Goodwin stated as his reasons for making the request that: (1) the old house which Mrs. Wheeler used as her legal residence was unsuitably large and difficult to maintain for a person of her age, and she wished to build a smaller, new house; (2) Mrs. Wheeler had been paying taxes on the Article II property since her husband's death, and she wished to avoid the burden of continuing to pay the taxes, presumably from personal funds; and (3) Ralph

---

[13] Steven Goodwin deposition at 73-74. State Street's Exhibit 1-F.

[14] Letter from Henry Tilghman to Steven Goodwin dated October 2, 1986. State Street's Exhibit 1-G.

[15] Letter from Steven Goodwin to Sharon Doherty-Clancy, dated February 4, 1987; and Goodwin invoice sent to Ralph Morrison on April 30, 1992, State Street's Exhibit 2-B.

Morrison and Mrs. Wheeler wished to be reimbursed for past expenses incurred in maintaining the Article II property (as permitted by the Merrill Wheeler Will).[16]

In the same letter to the bank dated February 4, 1987, Goodwin also asked, on behalf of Mary Wheeler, that after the bank purchased the Article II property, the bank then transfer approximately 50 acres of the land to her "for the purpose of constructing a new residence." Goodwin's letter states that the existing residence is not suitable for Mrs. Wheeler, and that the approximate cost of constructing a new house would be "in the $150,000 - $175,000 range." Enclosed with Goodwin's letter was a then-current appraisal (dated November 1986) of the 50-acre parcel reflecting a value of $45,000. The letter did not mention a purchase of property by Ralph Morrison.[17]

Mr. Goodwin's February 4, 1987 letter to the bank officers referred to discussions with Ralph Morrison, but it did not refer to discussions with Mary Wheeler, nor did it state clearly that Goodwin was representing Mary Wheeler at that time. Ms. Doherty-Clancy, who was the State Street Trust Officer for the Wheeler Trust from about 1984 or 1985 to about 1990 or 1991, never met Mary Wheeler. She does not remember whether she ever had any telephone conversations with Mary Wheeler.[18]

Handwritten notes by Sharon Doherty-Clancy suggest that she discussed the proposed transaction in a telephone conversation. Her notes refer to a letter from Goodwin "with proposals." They indicate that she discussed the liquidity problem (i.e., the Vermont real estate did not generate income with which to pay the related expenses); reimbursement of the Article II Trustees for expenses related to the property; a possible intestacy if property remained in the Article II Trust at the death of Mary Wheeler; a "no-cash" transaction (except for reimbursement of expenses) in transferring the property to the Article III and Article IV Trusts; Ralph Morrison's desire to purchase 50 acres; and a distribution from the marital trust (Article IV) to Mary Wheeler to build a new house.[19] Handwritten notes by Joan Preiss, identified by Doherty-Clancy, refer to 700 acres and a 9-bedroom house, and conclude that "Mrs. Wheeler still wants to use a house."[20]

---

[16] Letter from Steven Goodwin to Sharon Doherty-Clancy, dated February 4, 1987. State Street's Exhibits 1-H and 2-B.

[17] Id.

[18] Steven Goodwin letter to Sharon Doherty-Clancy, dated February 4, 1987, State Street's Exhibits 1-H and 2-B; deposition of Sharon Doherty-Clancy, Linda Moore's Tab 3.

[19] Handwritten notes, coupled with Sharon Doherty-Clancy's deposition testimony that she recognized her own handwriting. State Street's Exhibits 1-J, 2-D, 2-E, and Linda Moore's Tab 3.

[20] Sharon Doherty-Clancy's deposition, State Street's Exhibit 2-E, and Joan Preiss' handwritten notes, State Street's Exhibit 2-F.

9

Following receipt of Goodwin's letter dated February 4, 1987, Doherty-Clancy referred the request to State Street's Trust Administration Committee ("TAC"). On or about March 27, 1987, the TAC approved the proposed plan, whereby the Article III and Article IV Trusts would purchase the Vermont real estate from the Article II Trust, and a distribution of 50 acres would be made to Mary Wheeler, along with approximately $175,000 to build a new house and reimburse Mary Wheeler and Ralph Morrison for past expenses.[21] Minutes from the TAC meeting conclude as follows:

> After discussion, the Committee granted approval for Art. III and IV to purchase the real estate from the trustees of Art. II. When this is completed, a transfer of 50 acres and approximately $175,000 to Mary Wheeler for the construction of a new and smaller home and reimbursement to Mary and Ralph for past expenses. After the Art. III and IV purchase the house, the Real Estate Department will sell it.[22]

On April 23, 1987, Steven Goodwin wrote to Henry Tilghman to inform him that State Street had approved transfer of the Article II real estate to the Article III and Article IV Trusts, as well as a transfer of a portion of land to Mary Wheeler along with funds necessary to complete the building of a new house. The letter also states that "Ralph is interested in commencing construction as soon as possible."[23]

Steve Goodwin apparently thereafter spoke to Henry Tilghman, as he wrote to Ralph Morrison on May 4, 1987, as follows:

> Dear Ralph,
>
> I spoke with Henry Tilghman on the licenses and the transfer of the property on which you are building the home must be made to Mary in her own name and not to you. It must be done this way because that is the only way the Bank can, under the Will, make the distribution of land and pay the home construction costs. Once that is accomplished, Mary can deed the property over to you in your name alone or to your name and her name. Until the house is completed, however, title to the land must remain in Mary's name.

---

[21] State Street's Exhibits 1-K and 2-G (apparently minutes of State Street's TAC). Although the document provided in Exhibit 1-K does not have a date, it is undisputed based on other documents that State Street Bank approved the plan on or about March 27, 1987.

[22] Id.

[23] Letter from Steven Goodwin to Henry Tilghman, dated April 23, 1987. State Street's Exhibits 1-L and 2-N.

10

Sincerely,<br>Steven C. Goodwin[24]

State Street argues that the above letter shows Goodwin's understanding that Mary Wheeler and Ralph Morrison intended to later transfer the property to Morrison, either alone or in joint ownership with Mary Wheeler. Linda Moore argues that although the letter shows Goodwin's understanding of Morrison's intent, it does not shed light on Mary Wheeler's intent. State Street believes that Mary Wheeler's intent is sufficiently demonstrated by her signature on the deeds.

The parties disagree about the extent to which State Street knew in advance that Mary Wheeler intended to transfer 50 acres and the house to Ralph Morrison, which she did on July 27, 1987. Linda Moore maintains that State Street knew or should have known, because Philip Johnson's law firm assisted in the transfer, and that law firm also represented State Street. State Street maintains that it did not know of the transfer, and that its records show the trust officers' lack of awareness of the transfer as late as March 10, 1989.[25]

*Transfer of 52 Acres on July 27, 1987*

On May 11, 1987, Henry Tilghman, acting as attorney for the Article II Trustees Ralph Morrison and Mary Wheeler, filed two Motions for License to Sell Real Estate with the Probate Court. One motion pertains to 52 acres, more or less, in the Town of Cavendish. The other motion pertains to all of the remaining Article II Trust real estate in the Town of Cavendish. Tilghman's cover letter to the court states that the 52 acres will be conveyed to Mary Wheeler, and that the remaining real estate will be sold to the Article IV Trust. It is not clear why there is reference only to the Article IV Trust, and not to the Article III Trust.[26]

On June 11, 1987, the Probate Court granted the Article II Trustees licenses to sell the real estate held by that trust. One license related to the 52 acres; the other covered the remaining real estate in the Town of Cavendish. Neither license specified who the purchaser would be.[27]

---

[24] Letter from Steven Goodwin to Ralph Morrison dated May 4, 1987. State Street's Exhibits 1-M and 2-M.

[25] State Street interoffice memo from Sharon Doherty-Clancy to Jane Dewey dated March 10, 1989. State Street's Exhibit 1-N.

[26] Motion by Article II Trustees for License to Sell Real Estate, dated May 8, 1987, and cover letter from Henry Tilghman to Probate Court dated May 11, 1987. State Street's Exhibits 1-O and 1-P.

[27] Trustees' Licences to Sell, each approved on June 11, 1987. State Street's Exhibits 1-Q and 2-K.

11

Linda Moore maintains that the application to sell land, submitted to the Probate Court by Ralph Morrison and Mary Wheeler, was inconsistent with terms that had been proposed to, and approved by, State Street Bank.[28]

On July 27, 1987, Mary Wheeler and Ralph Morrison, as co-Trustees of the Article II Trust, deeded the 52-acre parcel to Mary Wheeler. Mary Wheeler signed the warranty deed. She also signed an addendum to the Property Transfer Return, although it does not appear that she signed the Property Transfer Return itself.[29]

That same day, July 27, 1987, Mary Wheeler deeded the same 52-acre parcel to Ralph and Anita Morrison. Once again Mary Wheeler signed the deed and the addendum to the Property Transfer Tax Return, although it does not appear that she signed the Property Tax Return itself.[30]

The deeds were executed in Belmont, Massachusetts. They were not recorded until September 28, 1987. Property transfer tax returns, prepared by Henry Tilghman as attorney for Ralph Morrison and Mary Wheeler, indicate that the transfer to Mrs. Wheeler was a "Transfer by Trust of Decedent Husband to his widow", that the transfer to Mr. Morrison was a "gift", and that both transfers were without consideration.[31]

Linda Moore maintains that the July 27, 1987, property transfers were inconsistent with the terms that had been proposed to, and approved by, State Street. She also observes that State Street should have known about the property transactions because Attorney Philip Johnson, who represented State Street, also assisted Ralph Morrison and Mary Wheeler in transferring the property, and State Street paid Johnson for his services out of the Article IV Trust.

The appraisal which Goodwin had referenced in his February 4, 1987, letter stated the value of the 52-acre parcel to be $45,000.[32] Joan Preiss' note dated September 18, 1986 indicates her understanding that Ralph Morrison had put approximately $50,000 into the

---

[28] Letter from Steven Goodwin to Henry Tilghman dated April 23, 1987. State Street's Exhibit 2-N.

[29] Deeds, property transfer tax returns, and addenda to property transfer tax returns. State Street's Exhibits 1-R and 2-L.

[30] Id.

[31] Id.

[32] Appraisal by William F. Whitney dated November 3, 1986. State Street's Exhibit 1-S.

property.[33]  In any event, no proceeds from the transfer of the 52-acre parcel were deposited into either the Article III or Article IV Trusts.

There is no evidence that the Article II Trustees, Ralph Morrison and Mary Wheeler, ever maintained cash accounts or filed accountings with the Probate Court, or that they ever reported transfers from that trust to the Probate Court.

*The Remaining Article II Trust Property*

The remaining Article II Trust property in Cavendish was not conveyed to the Article III Trust or to the Article IV Trust.  Portions were subsequently conveyed directly by the Article II Trustees to third parties.  As reported by Douglas Richards, Esq., the Successor Trustee of the Article II Trust, conveyances were made as follows:

> a.  Several transfers to Gulli, dated 2/3/89.  Proceeds of $100,000 received by State Street from Ralph Morrison and deposited to Article IV Trust account on 8/30/91.

> b.  Transfer to Stubelek (Stone House and surrounding land), dated 2/6/90.  Proceeds of $199,950 received by State Street from William Porter, Philip Johnson Law Offices, attorney for Ralph Morrison, and deposited to Article IV Trust.

> c.  Transfer to Blind Mare Meadow Farm, Inc. dated 3/23/90.  Proceeds of $2,900 received by State Street from Ralph Morrison and deposited to Article IV Trust.

> d.  Transfer to Pipkin, dated 2/15/91.  Proceeds of $13,387.50 received by State Street from Ralph Morrison and deposited to Article IV Trust.

> e.  Transfer to Stubelek, dated 8/9/94.  Proceeds of $15,443.91 received by State Street from Ralph Morrison and deposited to Article IV Trust.

After the death of Mary Wheeler (November 15, 1999), the remaining Article II Trust property was conveyed to an unrelated third party by the Successor Trustee for consideration of $400,000.  Net proceeds of $357,118.58 remain in the Article II Trust and have been invested by the Successor Trustee.

*Mary Wheeler's Wills*

---

[33] State Street's Exhibit 1-D.

On February 7, 1984, Mary Wheeler signed a will in which she appointed Ralph Morrison Executor, made three individual $10,000 bequests, named Ralph Morrison as sole beneficiary of her estate, and exercised her general testamentary power of appointment over the Article IV Trust property in favor of Ralph Morrison.

After Ralph Morrison died in 1995, Mary Wheeler signed a new will, drafted by Goodwin, on October 21, 1996. Mary Wheeler was then 98 years old. There is no claim that she was not of sound mind. In this will she named Linda Moore as Executrix and residuary beneficiary of her estate, and exercised her general testamentary power of appointment over the Article IV Trust property in favor of Linda Moore.

### *State Street Bank's Distribution of $225,000 to Mary Wheeler During 1987*

During 1987, State Street distributed a total of $225,000 from the Article IV Trust into Mary Wheeler's State Street Bank checking account. These distributions are shown on the accountings which Attorney Philip Johnson submitted to the Probate Court on behalf of State Street. They were made to the same checking account to which State Street regularly deposited trust income for Mary Wheeler.

Attorney Johnson submitted the 15th accounting, for the period October 1, 1986, through September 30, 1987, on June 9, 1988. That accounting shows two principal distributions from the Article IV Trust to Mary Wheeler's checking account # 8966-043-05, each in the amount of $100,000, on May 6, 1987, and on August 3, 1987. Each entry contains the notation, "per TAC request DTD 3/27/87." Mary Wheeler signed her approval of this accounting on April 20, 1988, and Attorney Johnson submitted her approval with the accounting on June 9, 1988. Other distributions during the same period were made only to the Internal Revenue Service, to Attorney Johnson, and to State Street Bank for its servicing fees. No distribution was made during that accounting period by State Street to Ralph Morrison or to any other individual.[34]

Linda Moore maintains that the above-described distributions were not "per TAC request DTD 3/27/87" because State Street's actions were not consistent with the decisions made by the TAC on that date. She also points out that the Probate Court docket sheet does not show any court approval of the above-described accounting, and that she filed an objection to that accounting on or about February 8, 2002.[35]

Attorney Johnson submitted the 16th accounting, for the period October 1, 1987 through September 30, 1988, on or about March 9, 1989. That accounting shows a principal distribution

---

[34] State Street's 15th Accounting for Article III and IV Trusts, for period October 1, 1986, through September 30, 1987, State Street's Exhibit 2-H.

[35] Linda Moore's Objection on Behalf of Mary B. Wheeler to Article Fourth Accounting for the Period Beginning October 1, 1986 and Ending September 30, 1987, Linda Moore Tab 5.

of $25,000 from the Article IV Trust to Mary Wheeler's State Street checking account, on September 30, 1987. The entry contains the notation "per TAC dated 3-27-87." Mary Wheeler signed her approval of this accounting, and the Probate Court later allowed this account.[36]

Linda Moore maintains that the September 30, 1987 distribution was not "per TAC dated 3-27-87" because State Street's actions were not consistent with the decisions made by the TAC on that date. She also points out that the Probate Court docket sheet does not show any court approval of the above-described accounting, and that she filed an objection to that accounting on or about February 8, 2002.[37]

*1987 Checks Totaling $225,000, from Mary Wheeler to Ralph Morrison*

During 1987, checks totaling $225,000 were written from Mary Wheeler's checking account # 8966-043-5 to Ralph Morrison. Those checks included: $60,000 on May 15, 1987; $40,000 on August 13, 1987; $100,000 on August 21, 1987; and $25,000 on November 24, 1987. One of those checks was signed by Mary Wheeler; the others were signed by Ralph Morrison. Mr. Morrison was not a co-owner of Mary Wheeler's account, but he had authority to sign checks on her account, and his authority continued until his death in 1995.[38]

Mary Wheeler never withdrew Ralph Morrison's signing authority on her checking account until after his death. Copies of checks from her account indicate that they were written in a variety of ways. Sometimes Morrison wrote out and signed the checks himself; sometimes he wrote out checks which Mary Wheeler signed; sometimes Mary Wheeler wrote out and signed her own checks; and after Morrison's death, sometimes Mary Wheeler signed checks written in an unidentified hand. Mary Wheeler continued to sign checks as late as May of 1999.[39]

*State Street's Payment of $169,689 to Ralph Morrison and Others*

In April of 1987, Sharon Clancy (later Sharon Doherty-Clancy), of the State Street Trust Department, received the following hand-written note from Mary Wheeler:[40]

---

[36] State Street's 16th Accounting for Article III and IV Trusts, for period October 1, 1987, through September 30, 1988, State Street Bank's Exhibits 2-I and 2-J.

[37] Linda Moore's Objection on Behalf of Mary B. Wheeler to Article Fourth Accounting for the Period Beginning October 1, 1987 and Ending September 30, 1988, Linda Moore Tab 5.

[38] State Street's Exhibits 2-O (copies of checks) and 2-P (Speed Letter dated June 15, 1995, indicating that Ralph Morrison had and should be removed as a signer on the account).

[39] State Street's Exhibit 2-Q (copies of checks written from Mary Wheeler's account).

[40] State Street's Exhibit 2-R.

Dear Ms. Clancy,

As you requested I wish you to reimburse Ralph directly for all of his past and current expenses he has incurred regarding the Vermont property.

> Very truly yours,
> Mary B. Wheeler

During the years 1988 through 1991, State Street made payments totaling $169,689.35 from the Article IV Trust directly to Ralph Morrison and others.[41] State Street says it made these payments based on the note from Mary Wheeler, to reimburse Morrison and others for expenses incurred with respect to the Vermont property. Linda Moore maintains that these payments were made at a time when Ralph and Anita Morrison were building three houses on the 52 acres that had been deeded to them.[42]

State Street's 17th Accounting for the Article IV Trust,[43] for the period October 1, 1988 to September 30, 1989, shows the following payments made directly to Ralph Morrison:

10-04-88    $10,000.00 paid to Ralph Morrison "per TAC request dtd 3/27/87 3/27/87"

02-13-89    $6,688.91 paid to Ralph Morrison, "reimbursement for surveying and legal expenses incurred for the Cavendish property per TAC request 3/27/87"

02-16-89    $540.00 paid to Ralph Morrison, "reimbursement for legal expenses per TAC request 3/27/89 [sic]"

The 17th Accounting for the Article IV Trust also shows the following:

02-09-89    $10,000.00 paid to L.C. Kelley and Associates "commission on sale of 162 acres in Cavendish per TAC request dtd 3/27/87"

08-14-89    $12,000.00 paid to Johnson Construction "for clearing and burning of 5.2 acres of Vermont property per TAC request dtd 8/14/89"

---

[41] Linda Moore's Tab 7 (copies of checks and invoices).

[42] Linda Moore's Tab 4 (Linda Moore's Affidavit).

[43] State Street's Exhibit 2-S (17th Accounting for Article IV Trust).

02-09-89          $100,000 received from Ralph Morrison "representing proceeds of sale of 162 acres in Cavendish held by the Estate of Merrill Wheeler"

Mary Wheeler signed her consent to the 17th Accounting, and the Probate Court allowed the 17th Accounting.[44] The Probate Court docket sheet does not include an entry indicating that the 17th Accounting was allowed.[45]

State Street's 18th Accounting for the Article IV Trust,[46] for the period October 1, 1989 to September 30, 1990, shows the following payments made directly to Ralph Morrison:

02-23-90          $9,672.95 paid to Ralph Morrison "for reimbursement of expenses incurred in preparation of Vermont property for sale per TAC Request dated 02/20/90"

04-24-90          $1,187.50 paid to Ralph Morrison "for reimbursement for engineering and surveying services in preparation of Vermont property for sale per TAC Request dated 04-13-90"

06-13-90          $12,000.00 paid to Ralph Morrison "for reimbursement for Johnson Construction for developing an 800 ft. road in preparing the Vermont property for sale per TAC Request dated 06/12/90"

07-18-90          $28,000.00 paid to Ralph Morrison "for reimbursement for finishing the development of an 800 ft. road and the start of sewage installation in preparing the Vermont property for sale per TAC Request dated July 16, 1990"

08-24-90          $21,000.00 paid to Ralph Morrison "reimbursement for engineering and surveying done by Michael Engineering Co. And Johnson Construction for the completion of a septic line in preparation of sale of Vermont property per TAC Request"

The 18th Accounting for the Article IV Trust also shows the following:

10-03-89          $11,600.00 paid to Johnson Construction "for seeding mulching and temporary road on 5.2 acres of

---

[44] Mary Wheeler's signed agreement that the 16th and 17th accountings were correct, and the Probate Court's Order allowing the 16th, 17th, and 18th Accounts, State Street's Exhibit 2-J.

[45] Probate Court Docket Sheet, Linda Moore's Tab 5.

[46] State Street's Exhibit 2-T (18th Accounting for Article IV Trust).

Vermont property per TAC Request
dated 10/03/89"

02-08-90       $199,950.00 received from Ralph Morrison "representing proceeds
               of sale of 21 acres of land located on Rt. 131, Cavendish, Vermont,
               and the Stone House"

03-29-90       $2,900.00 received from Ralph Morrison "representing proceeds of
               sale of 5 acres "Peck Lot" located in Cavendish, Vermont"

With reference to the above payments from the Article IV Trust, Linda Moore has
submitted State Street Bank TAC memos dated March 27, 1987; August 14, 1989; October 3,
1989; February 20, 1990; April 20, 1990; June 12, 1990; July 16, 1990; August 24, 1990; April
17, 1990; and October 30, 1990.[47] These memos indicate that Mary Wheeler requested the
payments. However, State Street has not provided corroborating evidence to show that Mary
Wheeler actually made each of the requests. Linda Moore also maintains that State Street made
payments to Ralph Morrison and others at a time when Ralph and Anita Morrison were building
three houses on the 52 acres that had been deeded to them.[48]

Mary Wheeler signed her consent to the 18th Accounting, and the Probate Court allowed
the 18th Accounting.[49] The Probate Court docket sheet does not include an entry indicating that
the 18th Accounting was allowed.[50]

State Street's 19th Accounting for the Article IV Trust,[51] for the period October 1, 1990 to
September 30, 1991, shows the following payment made directly to Ralph Morrison:

04-15-91       $22,000.00 paid to Ralph Morrison "as requested"

The 19th Accounting for the Article IV Trust also shows the following:

03-01-90       $13,387.50 received from Ralph Morrison "Representing proceeds
               of Sale of 15 1/2 acres of land located on 20 Mite [sic] Stream
               Road in Cavendish, VT"

---

[47] Linda Moore's Tab 7.

[48] Linda Moore's Tab 4 (Affidavit of Linda Moore).

[49] State Street's Exhibits 2-J and 2-U.

[50] Linda Moore's Tab 5 (Probate Court Docket Sheet).

[51] State Street's Exhibit 2-V.

State Street has submitted a TAC form dated April 17, 1991, reflecting approval of a request to pay Ralph Morrison $22,000.[52] This memo indicates that Mary Wheeler made the request. However, State Street Bank has not submitted corroborating evidence to show that Mary Wheeler actually made that request.[53]

State Street's 20th Accounting for the Article IV Trust,[54] for the period October 1, 1991 to September 30, 1992, shows the following payment made directly to Ralph Morrison:

> 11-07-91      $25,000.00 paid to Ralph Morrison "per TAC request dated 10/31/91"

State Street has submitted a TAC form dated October 31, 1991, reflecting approval of a request to pay Ralph Morrison $25,000 "for completion of the leech [sic] field, adding power, and to start testing other pieces of land in the town of Cavendish, Vermont."[55] This memo indicates that Mary Wheeler made the request. However, State Street Bank has not submitted corroborating evidence to show that Mary Wheeler actually made that request.[56]

State Street's 21st Accounting for the Article IV Trust,[57] for the period October 1, 1992 to September 30, 1993, shows total principal distributions for that year of $4,633.37.

Mary Wheeler signed her consent to the 19th, 20th, and 21st Accountings, and the Probate Court allowed those Accountings.[58]

State Street's 22nd Accounting for the Article IV Trust,[59] for the period October 1, 1993 to September 30, 1994, shows the following entry:

---

[52] State Street's Exhibit 2-W.

[53] See Linda Moore's Tab 7.

[54] State Street's Exhibit 2-X.

[55] State Street's Exhibit 2-Y.

[56] See Linda Moore's Tab 7.

[57] State Street's Exhibit 2-Z.

[58] State Street's Exhibit 2-AA.

[59] State Street's Exhibit 2-BB.

09-13-94    "Reimbursement (TAC request dated 7/13/89) as various parcels of Vermont property sold as money reimbursed back to Trust from Ralph Morrison"

The 22nd Accounting does not show disbursements to Ralph Morrison or to anyone else other than the bank, attorneys, or the IRS.

State Street's 23rd Accounting for the Article IV Trust,[60] for the period October 1, 1994 to September 30, 1995, shows no receipts or disbursements from principal other than to the bank, attorneys, and the IRS.

Mary Wheeler signed her consent to the 22nd and 23rd Accountings, and the Probate Court allowed those Accountings.[61]

The 24th, 25th, 26th, 27th, 28th and 29th Accountings[62] show neither receipts nor disbursements to Ralph Morrison, or to persons other than the bank, attorneys, or the IRS, until after the death of Mary Wheeler. After Mary Wheeler died, there were several disbursements related to preparing the remaining Article II Vermont property for sale.

*Taxes and Insurance on Article II Property*

As part of Count 1 of her Petition filed with the Probate Court on May 13, 2002, Linda Moore asserts that Mary Wheeler paid $135,715.11 for taxes, insurance, and other expenses to maintain the Article II Trust property in Vermont, while she was a Trustee for the Article II Trust. Exhibit B of Linda Moore's Petition is a chart of expenditures totaling $135,715.11. The listed expenditures are generally supported by copies of checks which Linda Moore submitted in response to the Article III Beneficiaries' motion for summary judgment.[63] The information is set forth in reorganized format in Table 1, which lists the expenditures on a yearly basis.

These charts show expenditures between 1969 and 2000. For present purposes, it is undisputed that all of the listed expenses were paid for the maintenance and management of the Article II Trust property. In addition, given Mary Wheeler's death in November of 1999, the

---

[60] State Street's Exhibit 2-CC.

[61] State Street's Exhibit 2-DD.

[62] State Street's Exhibit 2-EE.

[63] Tab 1 of Linda Moore's Response to Sawyers' Cross Motion for Summary Judgment, filed February 6, 2004 (checks written from Mary Wheeler's accounts with State Street Bank). Also see State Street's Exhibit 2-Q.

20

court assumes that Mary Wheeler paid all of the listed expenses through 1999, and that the Mary Wheeler Estate paid all of the listed expenses for 2000.

*Current Status of Trusts*

Article II property has subsequently been sold, and the amount of $357,118.58 remains in the hands of the Article II Trustee pending the outcome of probate proceedings, including the present appeal. It will presumably be divided equally between the Article III and IV Trusts.

Article III assets have been distributed to the Sawyer beneficiaries by State Street as Trustee, which reserved a nominal sum pending the completion of these proceedings. All parties agree that after the resolution of the pending issues, an accounting needs to be prepared which accurately allocates funds between the Article III and IV trusts, as some funds that should have been divided between the Article III and IV trusts were all deposited into the Article IV trust.

Article IV assets have been partially distributed, with $145,000 having been reserved pending the completion of these proceedings. Accurate accountings will determine the actual amount remaining for distribution to Linda Moore pursuant to Mary Wheeler's exercise of the general testamentary power of attorney.

**Conclusions of Law**

State Street and the Article III Beneficiaries together seek a determination that Linda Moore cannot surcharge State Street, or otherwise seek compensation from Article III trust assets for: (1) the 1987 transfer of 52 acres from the Article II Trust, (2) principal distributions of $225,000 from the Article IV Trust to Mary Wheeler, (3) principal distributions of $169,689 from the Article IV Trust to Ralph Morrison and others, and (4) Mary Wheeler's personal expenditures of over $135,715 to maintain the Article II Trust property.

Linda Moore has made claims in her various capacities as Executrix, residuary beneficiary (Mary Wheeler Estate), and appointee (Article IV Trust under will of Merrill Wheeler). A search of the facts and arguments shows that she does not have any claims as beneficiary of the Mary Wheeler Estate that can be distinguished from any claims she has as Executrix of the Mary Wheeler Estate. Any valid claim she asserts as Executrix will simply confer a like benefit upon herself as residuary beneficiary of the Estate. There are no separate causes of action based on a difference in these two roles. Her claims may therefore be grouped according to her two primary capacities as follows:

Appointee of Article IV trust assets
In this capacity, she seeks to surcharge State Street for a shortfall in Article IV trust assets resulting from:
(1) distribution of $225,000 in trust principal to Mary Wheeler without consideration,
(2) distribution of $169,689 in trust principal to Ralph Morrison and others without consideration, and

21

(3) failure to collect consideration for the 52 acres upon distribution from the Article II Trust.

These claims are based on allegations of improper trust administration on the part of State Street as Trustee, resulting in a diminution in the funds available to her at time of distribution of the Trusts.[64]

### Executrix of Estate of Mary Wheeler

In this capacity, she seeks compensation to reimburse the Mary Wheeler Estate for amounts paid by Mary Wheeler during her life for taxes, insurance, and other expenses associated with the Article II real estate. In the event that there are insufficient assets remaining, she also seeks to surcharge State Street for having made distributions without reserving sufficient funds to compensate Mary Wheeler's Estate for these expenses. The Article III Beneficiaries, in their motion for summary judgment, join in State Street's opposition to Linda Moore's claim for compensation for these expenses from any Trust assets.

## Claims of Linda Moore in her capacity as Appointee of Article IV Trust Assets

The essential dispute between Linda Moore on the one hand and State Street and the Article III Beneficiaries on the other is whether Mary Wheeler's actions during her lifetime amount to consent to the actions complained of, and whether such consent bars Linda Moore's present claims. Inherent in their respective positions is a difference in the parties' conceptions of consent. State Street relies on the conduct described in the undisputed facts as showing consent as a matter of fact and law. Linda Moore claims that there is a factual dispute over whether Mary Wheeler specifically intended the acts to which she allegedly manifested consent in written instruments.

### (1) Principal Distributions of $225,000 from Article IV Trust

The first issue raised by State Street's motion is whether Linda Moore can sustain any claim based on State Street's distribution of $225,000 from the Article IV Trust to Mary Wheeler during 1987. This distribution consisted of transfers to Mary Wheeler's checking account of $100,000 on May 6, 1987, $100,000 on August 3, 1987, and $25,000 on September 30, 1987. These transfers were then followed by checks written from Mary Wheeler's checking account to Ralph Morrison, consisting of $60,000 on May 15, 1987, $40,000 on August 13, 1987, $100,000 on August 21, 1987, and $25,000 on November 24, 1987. See Table 2 attached.

Linda Moore questions the propriety of these transfers because State Street failed to follow the proposed plan. Although State Street approved a plan to fund the construction of a house for Mary Wheeler, the money went to Ralph Morrison, $125,000 of the money having

_____

[64]While Linda Moore also asserts these claims in her capacity as Executrix and residuary beneficiary of the Estate of Mary Wheeler, the legal basis for claims in that capacity is unclear. Nonetheless, the Court has addressed those allegations in the analysis below.

been transferred to Ralph Morrison after Mary Wheeler deeded the property to Ralph Morrison on July 27, 1987.  Furthermore, State Street distributed $225,000, whereas the initial request was for only $175,000.

Linda Moore asserts that State Street's disbursement of $225,000 breached: its duty to give personal attention to the beneficiary (Count 3), its duty to carry out the terms of the trust (Count 4), its duty to be prudent (Count 5), and its duty to take active control of trust property (Count 6).

There is not sufficient evidence to determine the extent of Mary Wheeler's participation in making the initial request to State Street, although it does appear that Steven Goodwin represented both Mary Wheeler and Ralph Morrison as Article II Trustees when he proposed the plan to State Street on February 4, 1987.  Nevertheless, the undisputed facts support State Street's position that Mary Wheeler consented to the distribution.  First, State Street transferred the money directly into Mary Wheeler's checking account, thereby placing it directly under her control.  Second, Mary Wheeler approved the 15th and 16th accountings, which clearly showed the transfers to her.  The undisputed evidence of her conduct shows that she knew about the transfers and approved them.

Linda Moore suggests that the subsequent checks to Ralph Morrison somehow prove that the entire transaction was done without Mary's deliberate intention.  However, it was her decision to allow him to write checks from her account, and presumably her decision to allow him to write these particular checks.  As State Street points out, Mary Wheeler never rescinded Ralph Morrison's authority to write checks from her account until after his death in 1995.  There are no facts showing that Mary Wheeler was not competent.  Linda Moore apparently seeks to have the Court require State Street to show specific subjective intent, above and beyond the fact that she signed consents to the 15th and 16th accountings.  Linda Moore has set forth no legal authority for a requirement that the trustee bear such a burden of proof.  On the contrary, given the undisputed facts that Mary Wheeler was competent and controlled authorization over her checking account and consented to State Street's accountings, it is Linda Moore's burden to overcome the impact of such legal acts of consent by making affirmative showings of fraud, coercion, or undue influence, which she has not done.  The Court declines to require State Street to prove subjective deliberate intent affirmatively as to each transaction complained of where undisputed facts show legal acts of consent.

In her Prayer for Relief in her capacity as Executrix of the Mary Wheeler Estate, she asks for a surcharge against State Street in the amount of $225,000 plus interest from 1987.  Linda Moore as the Executrix of the Mary Wheeler Estate cannot complain about this transfer of $225,000 to Mary Wheeler, as Mary Wheeler herself, just prior to her death, had no grounds for such a complaint.  It is well established as a general rule that "a beneficiary cannot hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission consented to it."  Restatement (Second) of Trusts § 216(1).  It is also generally recognized that the executrix or beneficiary of the person who consented has no greater rights than the person through whom she inherits.  See *McKellop v. Jackman*, 50 Vt. 57,

23

62 (1877) (administrator may be estopped in the same manner that the decedent would have been estopped). Where Mary Wheeler participated in the transfers from Article IV to herself and from herself to Ralph Morrison, her Executrix cannot now complain that the Articles III and IV Trustee allowed her to do it. The transfer from the Article IV Trust was for the direct benefit of Mary Wheeler, and such transfers were specifically authorized by the terms of Article IV. Mary was then free to give the money to Ralph Morrison.

Linda Moore's primary contention is that the transfers impaired her rights as the appointee beneficiary of the remaining assets in the Article IV Trust at the time of Mary Wheeler's death. She maintains that the amount available to be appointed to her was lessened by these distributions. According to Linda Moore, Mary Wheeler was not free to impair her prospective rights as the appointee beneficiary of the remainder of the Article IV Trust. State Street maintains that Linda Moore is bound by Mary Wheeler's consent.

State Street's position is supported by the Restatement (Second) of Trusts § 216 and comments h, as follows:

> **§ 216. Consent of Beneficiary**
> (1) Except as stated in Subsections (2) and (3), a beneficiary cannot hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission consented to it.
>
> \* \* \*
>
> *Comment h: Consent by a beneficiary having a general power of appointment.* Where a beneficiary has a general power of appointment, even though it is a power to appoint by will alone, his consent to a breach of trust precludes the persons to whom he makes an appointment from holding the trustee liable for the breach of trust. So also, even if the beneficiary who has a general power of appointment fails to exercise the power, the persons taking in default of appointment are precluded by his consent from holding the trustee liable.

It is worth contrasting comment h regarding general testamentary powers of appointment with comment g, which addresses the different situation of concurrent and successive beneficiaries.

> *Comment g: Several beneficiaries.* If there are several beneficiaries, whether concurrent or successive, the consent of one of them to a deviation from the terms of the trust does not preclude the other beneficiaries from holding the trustee liable for breach of trust so far as their interests are affected.

24

For example, A creates a trust in which B and C have life interests in Blackacre, with the remainder to D. Under comment g, consent to a deviation by B would not bind C or D, who could still hold the trustee liable. That is a different situation than the one this case presents, in which Linda Moore is appointee of whatever portion Mary Wheeler chose to appoint to her in the exercise of a general testamentary power of appointment, which only takes effect at death. Linda Moore was not yet a beneficiary with a protected interest at the time Mary Wheeler gave consent during her lifetime.

Comments h and g draw a logical distinction between remainderpersons, whose rights derive from the initial will or instrument creating the trust, and appointees, whose rights derive from a donee's exercise of a general testamentary power of appointment, which takes effect only at death. Here Linda Moore's rights to the remainder of the Article IV Trust derive from Mary Wheeler's exercise of her general testamentary power of appointment. The rule under comment h, that the consent of a beneficiary having a general power of appointment will limit later actions by the appointee, is a logical extension of the general rule that a beneficiary of an estate will have no greater rights than the person through whom she inherits.

The principle stated in comment h is supported by decisions from other states, many of which are cited in the reporter's notes to § 216. See *In re Allen's Will*, 114 N.Y.S.2d 325, 328 (N.Y. A.D. 1952) (appointee stands in no better position than the person who appointed her); *In re Wildenburg's Estate*, 29 N.Y.S.2d 896 (N.Y. Surrogate's Ct. 1941) ("It would seem that considerations of equity and justice would require that the acts of the donee of a general power of appointment should, so far as is consistent with law and not against public policy, not be permitted to be challenged by those who ultimately find themselves to be the recipients of his generous bounty"); *Brown v. Fidelity Union Trust Co.*, 9 A.2d 311, 322 (N.J. Ct. Chancery 1939) (beneficiary holding a general power of appointment had the right not only to select the appointees, but also to fix the quantum of the estate which should go to each in such amounts as she chose); *In re Wilbur's Estate*, 5 A.2d 325, 330-31 (Pa. 1939) (life tenant with general power of appointment has an estate tantamount to a fee; and what he did with the trust estates bound his appointee); *Perkins' Trust Estate*, 170 A. 255, 256 (Pa. 1934) (where the life tenant is estopped from seeking a surcharge, so are the appointees who claim through him).

The above-cited cases turn on a principle of estoppel: an appointee is estopped if the person making the appointment would have been estopped. Linda Moore asserts that, as the appointee, she has standing to assert claims based on breaches of the trust. See, e.g, *In re Post's Will, Post v. Bowden*, 91 N.E.2d 698 (Ohio App. 1949) (after death of beneficiary, appointee has standing to raise objections). State Street does not contest Linda Moore's assertion of standing; rather State Street contends that Linda Moore is estopped by the actions of Mary Wheeler. The distinction between these two concepts is illustrated by *Smith v. Bank of Clearwater*, 479 So.2d 755 (Fla. App. 1985), where an appointee had standing to contest actions by the trustee that occurred prior to the death of the donor. If the assets were unlawfully diminished in value, then the appointee should have a right to sue to recover that lost value. *Id.* at 757. However, upon determining that the appointee had standing, the Florida court remanded the case for

consideration of other possible defenses, including the trustee's claim of consent by the donor. The remand was necessary because the record did not establish that the donor had consented to every disputed transaction. *Id*. Similarly, the issue in the instant case is not whether Linda Moore has standing, which she has, but whether she is estopped by Mary Wheeler's consent. The undisputed facts show Mary's consent to the 15th and 16th accountings, in which the transfers at issue were shown.

Linda Moore suggests that the above cases set forth a minority position which is contrary to Vermont law. She maintains that she is not estopped by Mary Wheeler's consent, and that her position is supported by 14 V.S.A. § 202, by V.R.P.P. 18, by Vermont cases, by cases from other states, and by the Uniform Probate Code and the Uniform Trust Code. The court has considered all of these sources, but they provide very little support for Linda Moore's position.

14 V.S.A. § 202(1) provides that certain persons are bound by orders that bind others. Under § 202(1)(A), orders binding the holder of a "presently exercisable general power of appointment . . . bind other persons to the extent their interests . . . are subject to the power." The statute does not apply to the instant circumstances, because Mary Wheeler held a general testamentary power of appointment which did not become effective until her death. It was not a presently exercisable power of appointment during her life. Linda Moore argues that, because the statute *does not* provide that orders binding Mary Wheeler are also binding on her prospective appointee, therefore the Probate Court orders approving the accountings, and Mary Wheeler's consent to those accountings, are not binding on her (Linda Moore). The statute does not support such a reading. Linda Moore's interest as an appointee derives from Mary Wheeler's exercise of her power of appointment, and the appointment takes effect only upon her death. She had no interest at all prior to the death of Mary Wheeler. Nothing in § 202 contradicts State Street's claim of estoppel.

Linda Moore also argues that her position is squarely supported by Vermont cases such as *St. Germaine's Admr. v. Tuttle*, 114 Vt. 263 (1945), and *Smith v. Deshaw*, 116 Vt. 441 (1951). However, these cases involved claims by parties with vested remainder interests. That is, they were named as remainderpersons by the creators of the trusts. In *Smith*, the Court held that where the settlor of a trust declares herself trustee and reserves only a restricted right to invade the principal, she creates a beneficial interest for the named remainderperson. 116 Vt. at 447-48. In *St. Germaine*, where the trustee had breached his fiduciary duties, the Church with the remainder interest was "not estopped to complain of improper investments because of the consent or acquiescence of the life tenant." 114 Vt. at 272. These cases involve claims by named successor beneficiaries, and the rulings are consistent with *comment g* of the Restatement (Second) of Trusts § 216 (consent of one beneficiary does not preclude successor beneficiary from holding trustee liable for a breach of trust). They do not contradict, or otherwise call into question, the doctrine described in *comment h* of § 216 (consent by beneficiary of general power of appointment will preclude the appointee from holding the trustee liable).

Linda Moore also cites to various cases from other states, generally supporting the proposition that a beneficiary with a power of appointment does not enjoy exactly the same

rights as the holder of a fee. See *Atwood v. First National Bank of Boston*, 320 N.E.2d 873 (Mass. 1974) (where the trustee has a broad but limited power to pay principal to the beneficiary who also holds a general testamentary power of appointment, the beneficiary does not have an absolute right to compel distribution of all of the assets, because the trust has not achieved all of its purposes); *In re Estate of Rotermund*, 61 Misc. 2d 324, 305 N.Y.S.2d 413 (Surrogate's Court 1969) (beneficiary had no right to invade principal of the trust, beyond its terms, without consent of all of the named contingent remainderpersons, even though she held a general power of appointment that could divest the remainderpersons of their contingent rights); *In re Post's Will, Post v. Bowden*, 91 N.E.2d 698 (Ohio App. 1949) (upon the death of the beneficiary, the appointees become remainderpersons with standing to object to the final accounting); *Hills v. Travelers Bank & Trust Co.*, 125 Conn. 640, 7 A.2d 652 (Conn. 1939) (court denies petition for distribution of trust principal, partly out of concern for rights of sons' unborn issue, which would have a contingent remainder interest that is not yet represented); *In re Hamburger's Will, First Wisconsin Trust Co. v. Hamburger*, 201 N.W. 267 (Wis. 1924) (court rejects widow's request to terminate trust and allow her complete control; despite her rights to receive income and to dispose of the principal by will, she was not the absolute owner).

Although these decisions support the general propositions (1) that a beneficiary in the position of Mary Wheeler has less than full control over the estate, and (2) that an appointee in the position of Linda Moore has standing to object to breaches of trust, they do not address the more specific questions raised by State Street's motion. None of these cases hold that a trustee is liable to an appointee who takes under a general testamentary power of attorney after the beneficiary had requested or consented to distributions of principal during her lifetime.

Finally, Linda Moore also maintains that her position is supported by the Uniform Probate Code and by the Uniform Trust Code, and that the provisions of those codes should be accepted as persuasive authority. The codes represent an effort by the Uniform Law Commissioners to provide states with a comprehensive model for codifying the law. The Uniform Probate Code has been adopted in eighteen states, and the Uniform Trust Code has been adopted in five states. Neither code has been adopted in Vermont.

Section 1-108 of the Uniform Probate Code (UPC) addresses acts by the holder of a presently exercisable general power of appointment.[65] The section is similar to 14 V.S.A. §

---

[65] The text of Uniform Probate Code § 1-108 is as follows:

> For the purpose of granting consent or approval with regard to the acts or accounts of a personal representative or trustee, including relief from liability or penalty for failure to post bond, to register a trust, or to perform other duties, and for purposes of consenting to modification or termination of a trust or to deviation from its terms, the sole holder or all co-holders of a presently exercisable general power of appointment, including one in the form of a power of amendment or revocation, are deemed to act for beneficiaries to the extent their interests (as objects, takers in default, or otherwise) are subject to the power.

27

202(1)(A) and Rule 18(a)(2) of the Rules of Probate Procedure.  Like those provisions of Vermont law, § 1-108 of the UPC does not address the effects of consent by a holder of a general testamentary power of appointment.  It does not apply to the issues raised by this case.

On the other hand, § 1-403 of the Uniform Probate Code contains the following general rule that may apply to this case.

### § 1-403.  Pleadings; When Parties Bound By Others; Notice.

In formal proceedings involving trusts or estates of decedents, minors, protected persons, or incapacitated persons, and in judicially supervised settlements, the following rules apply:

\*    \*    \*

(2) A person is bound by an order binding another in the following cases:

\*    \*    \*

(ii) To the extent there is no conflict of interest between them or among persons represented:

\*    \*    \*

(E) an order binding a sole holder or all co-holders of a general testamentary power of appointment binds other persons to the extent their interests as objects, takers in default, or otherwise are subject to the power.

A similar rule appears in Uniform Trust Code (UTC) § 302, as follows:

### § 302.  Representation by Holder of General Testamentary Power of Appointment

To the extent there is no conflict of interest between the holder of a general testamentary power of appointment and the persons represented with respect to the particular question or dispute, the holder may represent and bind persons whose interest, as permissible appointees, takers in default, or otherwise, are subject to the power.

Assuming the above provisions drafted by the Uniform Law Commissioners to be helpful at arriving at a sound decision, even though they are not controlling law, State Street and Linda Moore disagree about whether there is any conflict of interest between Mary Wheeler and Linda Moore. During her lifetime, Mary Wheeler was the income beneficiary of the Article IV Trust and could also benefit from principal distributions. She also held the power to dispose of remaining assets by exercising a general power of appointment, but only by will. Linda Moore became appointee beneficiary of the Article IV Trust proceeds upon Mary Wheeler's death, once the exercise of the testamentary power of appointment became effective. Linda Moore maintains that there is a "profound" conflict because any transfer of principal directly reduced her eventual interest as the appointee beneficiary.

Linda Moore's position ignores the fact that during Mary Wheeler's life, Linda Moore had no interest whatsoever. Mary Wheeler could have changed the appointee at any time up to the moment of death; Linda Moore had no vested interest and would have had no basis upon which to claim the trustee liable for conduct such as making distributions of principal. The fact that Linda Moore was also named Executrix and sole beneficiary under Mary Wheeler's will does not create a conflict of interest either, since in those capacities she had no role or enforceable interest until the death of Mary Wheeler. State Street's argument that UTC §302 provides further support for its position, rather than Linda Moore's, is persuasive.

In sum, Linda Moore is estopped from pursuing her claim against the bank for the $225,000 distributions. Under the Restatement (Second) of Trusts § 216, including comment h, the estoppel follows directly from Mary Wheeler's consent. Even considering the uniform code authorities relied upon by Linda Moore, under § 1-403 of the Uniform Probate Code, or § 302 of the Uniform Trust Code, Linda Moore is bound by Mary Wheeler's consent. Linda Moore has no claim, in any capacity, against State Street, based on State Street's transfer of $225,000 from the Article IV Trust to Mary Wheeler.

## (2) Payments of $169,689 from Article IV Trust

The second issue raised by State Street's motion is whether Linda Moore can sustain any claim based on State Street's distribution of $169,689 from the Article IV Trust to Ralph Morrison and others, during the years 1988 through 1991.[66] State Street maintains that it made

---

[66] Linda Moore listed these expenses in Exhibit C of her Petition for Equitable Relief. She has supported the listed expenses by submitting copies of checks and invoices, in Tab 7 of material she submitted in response to State Street's motion for partial summary judgment.

In some of the pleadings, the total expenses in this category are listed as $186,478. The larger figure consists of $169,689 alleged to have been paid to Ralph Morrison and others for improvement of the Vermont property (Exhibit C of the Petition), plus $16,789 alleged to have been paid to attorneys who assisted Ralph Morrison with the development of the property (Exhibit D of the Petition). The court's

29

these payments based on an April 1987 hand-written note from Mary Wheeler authorizing reimbursement to Ralph Morrison and others for expenses incurred with respect to the Article II property in Vermont. Linda Moore maintains that these payments were made at a time when Ralph and Anita Morrison were building three houses on the 52 acres that Mary Wheeler had deeded to them.

Linda Moore asserts that State Street's payments of $169,689 breached its duty to give personal attention to the beneficiary (Count 3), its duty to carry out the terms of the trust (Count 4), its duty to be prudent (Count 5), and its duty to take active control of trust property (Count 6). Her Prayer for Relief seeks to surcharge State Street for each disbursement, plus interest at the legal rate, both in her capacity as executrix of the Mary Wheeler estate, and in her capacity as appointee remainder beneficiary of the Article IV Trust.[67]

Mary Wheeler's April 1987 note asked State Street "to reimburse Ralph directly for all of his past and current expenses he has incurred regarding the Vermont property." The request is consistent with the plan submitted to and approved by State Street, which was for Mary Wheeler to build a house on a portion of the Article II land for herself, with building expenses coming from distributions from Article IV Trust principal. If Ralph Morrison initially incurred improvement costs himself, it would be reasonable for Mary Wheeler to authorize the funds to go directly to him as reimbursement. On the other hand, the timing of the authorization and payments raises legitimate questions: by the time State Street made the first of the disputed payments directly to Ralph in the fall of 1988, Mary Wheeler had already transferred the 52 acre parcel to Ralph and Anita Morrison.[68] Linda Moore has set forth a plausible claim that some of the reimbursed expenses were incurred improving land that was no longer owned by the Article II Trust.

Mary Wheeler did, however, sign her consent to the 17th, 18th, 19th, and 20th accountings, which show the disbursements to Ralph Morrison and others, and the Probate Court allowed those accountings. Based on these undisputed facts, Mary Wheeler knew about the disbursements and agreed to them. Linda Moore questions the validity of Mary Wheeler's

---

analysis is limited to the lower figure of $169,689, because State Street's motion for summary judgment limits its arguments to the expenses listed in Exhibit C.

[67]While Linda Moore's Prayer for Relief seeks to surcharge State Street for this claim in her capacity as Executrix of the Estate of Mary Wheeler, the legal foundation for such a claim has not been supported. Mary Wheeler's lifetime consents to the disbursements bind Linda Moore in her role as executrix and beneficiary of the Mary Wheeler estate. *McKellop v. Jackman*, 50 Vt. at 62 (administrator may be estopped in the same manner that the decedent would have been estopped). Therefore, the analysis focuses on the claim in her capacity as appointee.

[68] State Street received Mary's note in April of 1987. The following July, the Article II Trust transferred 52 acres to Mary Wheeler, and she then transferred the same 52 acres to Ralph and Anita Morrison. State Street paid the first $10,000 of the disputed $169,689 to Ralph Morrison in October of 1988.

consent, on the ground that she, Mary Wheeler, was not given enough information to make an informed decision. In essence she asks the court to make an inference and use it to overcome the effect of Mary Wheeler's written consents, which were adopted by the Probate Court as the basis for its orders approving the accountings. Linda Moore has not alleged specific facts sufficient to overcome the undisputed facts showing consent.

Moreover, a decision from the probate court is generally conclusive as to all matters covered by the decree. *Ransom v. Bebernitz*, 172 Vt. 423, 427-29 (2001) (citing *In re Estate of Walker*, 119 Vt. 130 (1956)). On the other hand, a collateral attack is permissible if the subject matter is collateral to the issues that the probate court actually adjudicated. *Id*. at 428-29 (citing *In re Estate of Valiquette*, 122 Vt. 350 (1961)). The Court in *Valiquette* held that neither the life tenant's consent nor the probate court's approval of an accounting were binding on the issue of whether stock dividends should be allocated to income or to corpus, because the issue was not raised in the proceedings. In preparing the earlier accounts for submission to the court, the trustee did not intend to indicate an allocation one way or another; instead he believed that the question was left open for a later judicial determination. *Id*. at 354. "There was nothing in the annual account to inform the probate court that it was adjudicating a question of this sort." *Id*. at 360-61. Given the lack of indication that the issue had been raised in the earlier accounting, the life tenant had not relinquished her rights, and the executor was not barred from raising the issue later. *Id*. at 361.

The instant case differs from *Valiquette* because the issues raised by State Street's motion were clearly indicated on the annual accountings. It is undisputed that the accountings showed the disbursements to Ralph Morrison and others as distributions from principal. Mary Wheeler agreed to those accountings, and the court approved them. Mary Wheeler herself was estopped from questioning the disbursements at a later time.

Just as Mary Wheeler's consent would have estopped her, it estops Linda Moore in her role as the appointee beneficiary. Under the Restatement (Second) of Trusts § 216, comment h, the estoppel follows directly from Mary Wheeler's consent. Under § 1-403 of the Uniform Probate Code, or under § 302 of the Uniform Trust Code, Linda Moore is bound by Mary Wheeler's consent to the extent there is no conflict of interest with respect to the particular question in dispute. No conflict of interest has been shown. At the time of the payments, Mary Wheeler held the income interest; she could ask for principal distributions for her support, comfort, and general welfare; and she also held the power of appointment to the remainder of the principal. Her consent to the distributions did not affect anybody else's vested interests. When Linda Moore acquired her interests, upon the death of Mary Wheeler, she became the beneficiary of both the estate and the remainder of the principal, deriving all of her interests directly from Mary Wheeler. At no time did she hold any interest in conflict with Mary. Thus Linda Moore's claim to a surcharge against State Street based on disbursements of $169,689 from the Article IV Trust is not supported by any of the cited sources of law. State Street is entitled to summary judgment on this issue.

31

*(3)  Transfer of 52 Acres from Article II Trust*

A third issue raised by State Street's motion is whether Linda Moore can sustain any claim against State Street based on the July 27, 1987 transfer of 52 acres from the Article II Trust, first to Mary Wheeler and then to Ralph and Anita Morrison, all without consideration. The first transfer was from Mary Wheeler and Ralph Morrison as Trustees of the Article II Trust to Mary Wheeler in her own right. The second transfer, on the same day, was from Mary Wheeler to Ralph and Anita Morrison. State Street did not directly participate in those transfers, nor is there any direct evidence that State Street knew about the transfers until years later. The parties had discussed a plan involving transfers of Article II property to State Street as Trustee of the Article III and IV Trusts, followed by a transfer of 52 acres to Mary Wheeler, and State Street's TAC had approved that plan on March 27, 1987. However, the actual transfers varied from that plan. The Article II Trustees never transferred any real property to the Article III and IV Trustee. Thus State Street, as Trustee, never had responsibility for any of the real estate.

Linda Moore claims that State Street breached various duties when it permitted Mary Wheeler to convey the 52-acre parcel to Ralph Morrison without consideration. She argues that State Street should have known about the transfer because of Attorney Johnson's involvement, and that it had a duty to collect consideration. Presumably she bases this argument on the provisions of Article II, which limit the authority of the Article II trustees in disposing of the real estate to selling it and dividing the proceeds between the Article III and IV Trusts.

Linda Moore's Petition includes these claims within Count 3 (breach of duty to give personal attention to beneficiary of Article IV Trust), Count 4 (breach of duty to carry out terms of the Trusts), and Count 5 (breach of duty to be prudent). Linda Moore's Prayer For Relief does not specify that she seeks any particular remedy for these alleged breaches. State Street points out that if State Street is liable for unpaid consideration of the real estate, it has a claim over against the Estate of Mary Wheeler, thereby reducing what Linda Moore would receive as estate beneficiary.

State Street argues that it is Trustee of the Article III and IV Trusts, but not of the Article II Trust, and it had no authority to mandate the manner in which the Article II Trustees carried out their trust responsibilities. State Street also argues generally that Linda Moore is estopped from seeking a surcharge or other compensation for breaches of duty to which Mary Wheeler consented. Assuming *arguendo* that State Street breached its duties by permitting the transfers to take place without consideration, State Street maintains that Linda Moore is bound by Mary Wheeler's consent. Linda Moore's interests derive from Mary Wheeler, whether she advances her claims as Executrix and sole beneficiary of Mary Wheeler's estate, or whether she does so as Mary Wheeler's appointee to the remainder of the Article IV Trust. In responding to State Street's motion, Linda Moore argues generally that State Street was obligated to protect her rights as a remainderperson, whether or not Mary Wheeler consented to a breach.

As State Street points out, Mary Wheeler's transfer of 52 acres presents a clear example of conduct to which she consented. In the first stage of the transfer, Mary Wheeler and Ralph

32

Morrison deeded the land to Mary Wheeler in her own right. State Street was not involved. Although it had previously approved the plan of transferring the property to Mary Wheeler without consideration, the approved plan was structured differently than what was actually done by the Article II Trustees.[69] In the second stage of the transfer, Mary Wheeler deeded the property to Ralph and Anita Morrison as a gift. Again, the transfer took place without any direct involvement by State Street. Mary Wheeler signed both deeds, and there are no facts to show that she did not do so freely and voluntarily, as a competent adult.

After considering all of the arguments by both parties, the court concludes that Linda Moore has no claim, in any capacity, against State Street, based on Mary Wheeler's transfer of 52 acres from the Article II Trust. Even if State Street acquiesced in the first transfer, Mary Wheeler gave her consent, which is binding on Linda Moore. Even if State Street knew about the second transfer, that was beyond State Street's control as a gift from Mary Wheeler to Ralph Morrison. There is no basis for holding State Street liable.

## Claims of Linda Moore in her capacity as Executrix of the Estate of Mary Wheeler

The fourth issue raised by State Street's motion, which is also raised by the Article III Beneficiaries' motion, is whether Linda Moore is barred from seeking reimbursement for Mary Wheeler's expenditures of over $135,715 to maintain the Article II Trust property. Linda Moore has set forth these expenditures in Exhibit B of her Petition, and the court has listed the expenditures in Table 1 attached.

In Count 1 of her Petition, Linda Moore claims she is "entitled to reimbursement for the funds advanced in regard to the Article Second property by Mary prior to her death, in the sum of $135,715.11, plus interest at the legal rate, as set forth in Exhibit B." In her Prayer for Relief, she asks for reimbursement, both in her capacity as Executrix of the Mary Wheeler Estate and in her capacity as appointee beneficiary of the Article IV Trust, though the basis for her claim as appointee is unclear.

Under Article II of Merrill Wheeler's will, State Street as Trustee of the Article III and IV Trusts was authorized to reimburse the Article II Trustees for expenses paid to maintain the Article II Trust property. State Street was not required to provide reimbursement absent a request. There is no evidence that Mary Wheeler ever requested reimbursement for these expenses. At issue is whether Linda Moore has a right to reimbursement now, in her role as Executrix of the Mary Wheeler Estate.

---

[69] State Street had a good faith basis for approving a transfer of property to Mary Wheeler for the purpose of constructing a new home. As the Article IV Trustee, it had discretion to distribute parts of the principal "as it may deem desirable for [her] support, comfort, and general welfare."

State Street and the Article III Beneficiaries maintain that Linda Moore is estopped by Mary Wheeler's consent or acquiescence, and also generally that the claims should be barred by the equitable doctrine of laches. The thrust of their arguments is that Mary Wheeler waited too long to request reimbursement, and that her Executrix should not be allowed to do so now.

There is no evidence that Mary Wheeler ever requested reimbursement for such expenses during her lifetime. Moreover, there is no evidence that when Article II real estate was sold in 1973, 1989, 1990, 1991, and 1994, the Article II Trustees did or did not "withhold from such proceeds such sums as they deem necessary to provide them with sufficient cash to pay or indemnify themselves against any taxes, expenses, and upkeep of any of the trust property for which they might be liable until such time as such necessity, in their opinion, no longer exists." If they did this, they did not keep records of it in the form of accountings. If they did not do it and turned over all the proceeds to State Street for the residuary trusts, such conduct amounted to a waiver of any such claim. The failure of the Article II Trustees to file accountings with the Probate Court also amounts to a waiver by them as individuals to seek reimbursement for expenses paid by them personally, as that was the means by which they could have preserved their individual claims against trust assets, pending sale of Article II property.

Therefore, for all years prior to the year of Mary Wheeler's death, she was barred by waiver from seeking retroactive reimbursement for such expenses, and Linda Moore as Executrix of her Estate is likewise barred. To the extent that Mary Wheeler incurred such expenses in the year of her death, or her Estate did so afterward, Article II specifies that payment or indemnification shall be made from proceeds of the sale of Article II property. It is unknown whether such claims have been submitted to the Article II Trustee. In any event, Linda Moore has not shown that there are insufficient funds in Article II to satisfy allowable claims for 1999 or thereafter. Therefore, her present claim against Article III or IV Trust assets, or claim to surcharge State Street as Trustee, fails.

## ORDER

For the foregoing reasons,

State Street's Motion for Partial Summary Judgment is *granted,* and
The Article III Beneficiaries' Motion for Summary Judgment is *granted.*

Dated at Hartford, Vermont, this 30th day of December, 2004.

_____
Hon. Mary Miles Teachout
Superior Judge

34

| Table 1 – | Article II | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Year | Taxes | Insurance | Legal Fees | Appraisals or Evaluations | Totals | Sale Proceeds to State Street | Accounting Filed? |
| 1969 | $ 1,589.31 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,589.31 | $ 0.00 | No |
| 1970 | $ 2,084.10 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,084.10 | $ 0.00 | No |
| 1971 | $ 2,213.39 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,213.39 | $ 0.00 | No |
| 1972 | $ 1,701.02 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,701.02 | $ 0.00 | No |
| 1973 | $ 1,268.18 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,268.18 | $ 6,000.00 | No |
| 1974 | $ 1,599.50 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,599.50 | $ 0.00 | No |
| 1975 | $ 1,644.63 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,644.63 | $ 0.00 | No |
| 1976 | $ 2,043.10 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,043.10 | $ 0.00 | No |
| 1977 | $ 2,121.27 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,121.27 | $ 0.00 | No |
| 1978 | $ 2,207.84 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,207.84 | $ 0.00 | No |
| 1979 | $ 2,221.46 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,221.46 | $ 0.00 | No |
| 1980 | $ 2,147.55 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,147.55 | $ 0.00 | No |
| 1981 | $ 2,283.47 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,283.47 | $ 0.00 | No |
| 1982 | $ 2,088.01 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,088.01 | $ 0.00 | No |
| 1983 | $ 2,997.40 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,997.40 | $ 0.00 | No |
| 1984 | $ 3,728.75 | $ 0.00 | $ 0.00 | $ 0.00 | $ 3,728.75 | $ 0.00 | No |
| 1985 | $ 8,549.52 | $ 0.00 | $ 0.00 | $ 0.00 | $ 8,549.52 | $ 0.00 | No |
| 1986 | $ 5,060.02 | $ 0.00 | $ 0.00 | $ 0.00 | $ 5,060.02 | $ 0.00 | No |

| | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---|
| 1987 | $ 9,916.82 | $ 0.00 | $ 0.00 | $ 0.00 | $ 9,916.82 | $ 0.00 | No |
| 1988 | $ 10,357.09 | $ 0.00 | $ 0.00 | $ 0.00 | $ 10,357.09 | $ 0.00 | No |
| 1989 | $ 4,633.17 | $ 0.00 | $ 0.00 | $ 0.00 | $ 4,633.17 | $ 100,000.00 | No |
| 1990 | $ 9,698.39 | $ 0.00 | $ 0.00 | $ 0.00 | $ 9,698.39 | $ 202,850.00 | No |
| 1991 | $ 4,892.90 | $ 0.00 | $ 0.00 | $ 0.00 | $ 4,892.90 | $ 13,387.50 | No |
| 1992 | $ 8,292.02 | $ 0.00 | $ 0.00 | $ 0.00 | $ 8,292.02 | $ 0.00 | No |
| 1993 | $ 4,442.97 | $ 0.00 | $ 0.00 | $ 0.00 | $ 4,442.97 | $ 0.00 | No |
| 1994 | $ 4,067.15 | $ 0.00 | $ 0.00 | $ 0.00 | $ 4,067.15 | $ 15,443.91 | No |
| 1995 | $ 2,430.56 | $ 0.00 | $ 0.00 | $ 0.00 | $ 2,430.56 | $ 0.00 | No |
| 1996 | $ 3,305.50 | $ 0.00 | $ 0.00 | $ 0.00 | $ 3,305.50 | $ 0.00 | No |
| 1997 | $ 3,394.42 | $ 0.00 | $ 0.00 | $ 0.00 | $ 3,394.42 | $ 0.00 | No |
| 1998 | $ 4,094.58 | $ 0.00 | $ 0.00 | $ 0.00 | $ 4,094.58 | $ 0.00 | No |
| 1999 | $ 864.69 | $ 0.00 | $ 2,674.25 | $ 2,000.00 | $ 5,538.94 | $ 0.00 | ? |
| 2000 | $ 59.78 | $ 1,065.00 | $ 10,165.30 | $ 1,812.00 | $ 13,102.08 | $ 0.00 | ? |
| Totals: | $ 117,998.56 | $ 1,065.00 | $ 12,839.55 | $ 3,812.00 | $ 135,715.11 | $ 337,681.41 | |

| Table 2 | | | |
|---|---|---|---|
| | | | |
| In re: | Trust Estates of | Merrill Wheeler: | Chronology for 1987 |
| | | | |
| Date | $ to Mary checking | $ to Morrison from Mary | Other Events |
| | | | |
| 02/04/87 | | | Goodwin Letter to Doherty-Clancy of State Street, proposing sale of real estate |
| 03/12/87 | | | Meeting of Goodwin, Morrison, and Bergquist |
| 03/27/87 | | | State Street TAC met and approved plan proposed by Goodwin |
| 04/02/87 | | | Meeting: Goodwin at State Street Bank |
| 04/23/87 | | | Goodwin letter to Tilghman, informing him of State Street approval of plan |
| 04/??/87 | | | Mary Wheeler letter to Doherty-Clancy re: reimbursing Morrison |
| 05/04/87 | | | Goodwin letter to Morrison, re: transfer of property to Mary Wheeler |
| 05/06/87 | $100,000 to checking | | |
| 05/11/87 | | | Tilghman filed Motions for Licenses to sell real estate |

| | | | |
|---|---|---|---|
| 05/15/87 | | $60,000 check to R. Morrison | |
| 06/11/87 | | | Probate Court approved two applications for sale of land (including 52 acres) |
| 07/27/87 | | | (1) Article II Trust transferred 52-acre parcel to Mary Wheeler |
| 07/27/87 | | | (2) Mary Wheeler transferred 52-acre parcel to Ralph and Anita Morrison |
| 08/03/87 | $100,000 to checking | | |
| 08/13/87 | | $40,000 check to R. Morrison | |
| 08/21/87 | | $100,000 check to R. Morrison | |
| 09/30/87 | $25,000 to checking | | |
| 11/24/87 | | $25,000 check to R. Morrison | |